Opinion
KINGSLEY, Acting P. J.
This is an appeal from the judgment for defendants in a medical malpractice case. The judgment is reversed in part and is affirmed in part.
This case involves allegedly negligent actions and omissions by the two defendant doctors in the course of their treatment of the plaintiff, between Februaiy 11 and March 19, 1972, for acute frontal sinusitis.
*490 Plaintiff alleges that, as a proximate result of these negligent actions and omissions, he suffered a brain abscess for which he had to undergo surgery for an en bloc removal of the entire anterior portion of the right frontal lobe of his brain (prefrontal lobotomy).
The alleged-to-be negligent actions and omissions of the defendants consisted for the most part of: the failure to perform a culture and sensitivity test prior to February 29, 1972; the failure to take sinus X-rays prior to February 29, 1972; the giving and prescribing of inappropriate antibiotics to the plaintiff which in turn also masked the plaintiff’s symptoms; the failure to furnish any antibiotics at all between about February 16, 1972, and February 20, 1972, and again between March 10, 1972, and fyiarch 13, 1972; and the failure to make timely usage of available means of obtaining drainage by way of delay in removing the polyps, delay in performing antrum irrigation, the failure to perform a trephination and the failure to apply cocaine packs.
I
From the uncontroverted facts of this case it is unquestionable that no negligent liability exists on the part of Dr. Wasserman. The record shows that Dr. Wasserman’s only contact with the plaintiff occurred on February 10, 1972. On that day, the plaintiff experienced a sudden and sharp headache while he was at work. He took an aspirin but, feeling no relief, went home. Once home his wife then attempted to call Dr. Owen. She was unable to reach him, but instead talked to Dr. Wasserman who was covering for Dr. Owen. Dr. Wasserman stated that the plaintiff’s symptoms sounded like sinusitis, but he refused to prescribe any medication over the telephone. Instead, he suggested that the plaintiff shquld take some aspirin and see Dr. Owen the following morning. Dr. Wasserman was then never further contacted or consulted by the plaintiff. The next morning the plaintiff went to see Dr. Owen.
It is clear from the record of this case that Dr. Wasserman was not responsible for any of the allegedly negligent acts or omissions which the plaintiff claims were the proximate cause of his brain abscess. Dr. Wasserman never personally saw the plaintiff and never diagnosed or treated him. The only contact which had occurred between the plaintiff and Dr. Wasserman was that which indirectly arose by way of the call made by the plaintiff’s wife to Dr. Owen. Thus, we uphold the trial court’s judgment as to Dr. Wasserman, since the plaintiff has furnished no grounds upon which a juiy could find him negligent. The plaintiff’s *491 claims of negligence only concern the treatment received by the plaintiff beginning from the time of his first visit to Dr. Owen on February 11, 1972.
II
With regard to Dr. Owen, the judgment of the trial court must be reversed. This is required because the trial judge erroneously charged the jury with respect to contributory negligence on the part of the plaintiff.
Before discussing the contributory negligence aspect of this case, we will first discuss the remaining issues that were raised on this appeal.
 (A) Plaintiff contends that there was uncontroverted medical testimony which established that a culture and sensitivity test is essential for the proper diagnosis and treatment of frontal sinusitis. Thereupon plaintiff further claims that, since the test was simple, safe, inexpensive and highly diagnostic, defendant Owen was negligent as a matter of law in not submitting the plaintiff to such a test at an earlier time than February 29, 1972.
We disagree with the plaintiff’s contention and further fail to agree with the respondent’s contention that the appellant has acted improperly by raising the issue of negligence as a matter of law for the first time on this appeal.
The court in Panopulos v. Maderis (1956) 47 Cal.2d 337, 340-341 [303 P.2d 738] stated: “It is the general rule that a party to an action may not, for the first time on appeal, change the theory of the cause of action. [Citations.] There are exceptions but the general rule is especially true when the theory newly presented involves controverted questions of fact or mixed questions of law and fact. If a question of law only is presented on the facts appearing in the record the change in theory may be permitted.” (See Schirmer v. Drexler (1901) 134 Cal. 134 [66 P. 180]; Bogacki v. Board of Supervisors (1971) 5 Cal.3d 771 [97 Cal.Rptr. 657, 489 P.2d 537]; Carmichael v. Reitz (1971) 17 Cal.App.3d 958 [95 Cal.Rptr. 381].)
Thus, the appellant’s newly presented theory may be permitted, because it involves only a question of law and is based entirely upon the facts appearing in the record.
*492 To support his contention, plaintiff primarily relies upon the case of Helling v. Carey (1974) 83 Wn.2d 514 [519 P.2d 981]. There the plaintiff sued an opthalmologist for malpractice alleging that, because of the defendant’s negligent failure to diagnose and treat her for open-angle glaucoma, she suffered permanent visual damage. The plaintiff in that case had been to see the defendant numerous times over a period of several years complaining about eye problems. The record indicates that the plaintiff had been in to see the defendant with complaints about her eyes in September 1963, October 1963, February 1967, September 1967, October 1967, May 1968, July 1968, August 1968, September 1968 and finally in October 1968. It was not until October 1968 that the glaucoma test finally was given. At trial the defendant testified that throughout this entire period the plaintiff had detectable glaucoma.
The Supreme Court of Washington held that the defendants were negligent as a matter of law for failing to administer a simple, safe and inexpensive glaucoma test that was highly diagnostic of the potentially serious illness. This was held despite the uncontradicted expert testimony that it was the universal practice of opthalmologists not to administer the test to persons under forty, because there was less than a 1/25000 incidence that such persons would have the disease. The court státed, however, “The precaution of giving this test to detect the incidence of glaucoma to pátients under 40 years of age is so imperative that irrespective of its disregard by the standards of the opthalmology profession, it is the duty of the courts to say what is required to protect patients under 40„ from the damaging results of glaucoma.” Thus, negligence was found here as a matter of law.
The court also noted that glaucoma has no symptoms, and, in the absence of a pressure test, it is often undetectable until the damage has become extensive and irreversible.
Thus, the Washington court found that the proper standard of care to be followed by opthalmologists was not that which is usually done, but that which ought to be done. The court cited two cases to support its position.
In Texas & Pacific Ry. Co. v. Behymer (1903) 189 U.S. 468, 470 [47 L.Ed. 905, 906, 23 S.Ct. 622], Mr. Justice Holmes stated for the majority that, “What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not.” In that case the court stated *493 that, just because it was the custom to jerk railroad cars, it was negligent to do so when everyone involved knew that the plaintiff-brakeman was standing on the ice-covered rooftop of one of the cars.
In the second cited case, The T. J. Hooper (2d Cir. 1932) 60 F.2d 737, 740, Justice L. Hand stated that, “[I]n most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission.” This case dealt with the custom not to cany radio sets on barges.
As the plaintiff cites from Prosser on Torts (4th ed. 1971) section 33, pages 167-168, “. .. every custom is not conclusive merely because it is a custom.”
We fully agree with the plaintiff’s contentions on the connection between custom and due care. However, we faiLto see how this leads to the conclusion that, because a custom may be negligent, such negligence can be found as a matter of law. Neither of the Washington court’s two supporting cases stands for this proposition. They only support the idea that custom is not the absolute standard to be applied in determining the issue of negligence. Furthermore, these cases only dealt with customs associated with business and industry and not with the medical professions.
In response to the appellant’s allegation, the respondent properly contends that the general rule concerning medical negligence is that such liability may not be found as a matter of law. In most instances there is the need for expert testimony on the subject of just what constitutes medical negligence, because the average judge or juror does not possess the necessary level of knowledge about medical practice and procedure to decide on his own whether the doctor was negligent. Therefore, it is usually a question of fact, for the triers of fact, as to whether the doctor was negligent based upon the expert testimony that was received into court.
In Folk v. Kilk (1975) 53 Cal.App.3d 176, 185 [126 Cal.Rptr. 172], the court stated that, “The law requires only that doctors exercise that reasonable degree of skill, knowledge and care ordinarily possessed and *494 exercised by doctors under similar circumstances in diagnosis and treatment, with no different or higher degree of responsibility than that obtaining in their professional community.” As such, the court went on to say that, “The standard of skill, knowledge and care prevailing in a medical community is ordinarily a matter within the knowledge of experts. Where a medical process or procedure is not a matter of common knowledge, expert testimony is necessary to determine whether a probability of negligence appears from the happening of an accident or untoward result.”
However, as stated in Prosser on Torts (4th ed. 1971) section 32, pages 164-165, “Where the matter is regarded as within the common knowledge of laymen, as where the surgeon saws off the wrong leg, or there is injury to a part of the body not within the operative field, it has been held that the jury may infer negligence without the aid of any expert.”
Therefore, only in those situations where common knowledge can determine whether a medical practitioner is “negligent” can such “negligence” be found to exist as a matter of law. Judges are not better equipped than juries to determine whether a given course of treatment or diagnosis was lacking in due care standards. In such cases the triers of fact must determine the issue based upon expert testimony.
In Bardessono v. Michels (1970) 3 Cal.3d 780, 789-790 [91 Cal.Rptr. 760, 478 P.2d 480, 45 A.L.R.3d 717], the court lists, “. . . the wide variety of cases in which courts have found sufficient common knowledge and observation among laymen, regardless of expert testimony, to indicate ‘that the consequences of the professional treatment were not such as ordinarily would have followed if due care had been exercised.’ ”
Some examples which the court cited were: Leonard v. Watsonville Community Hosp. (1956) 47 Cal.2d 509, 514 [305 P.2d 36], where a clamp was left in the abdomen; Ybarra v. Spangard (1944) 25 Cal.2d 486, 488-489 [154 P.2d 687, 162 A.L.R. 1258], where a shoulder injury occurred during an appendectomy; Ales v. Ryan (1936) 8 Cal.2d 82, 95-96 [64 P.2d 409], where a sponge was left in abdomen after surgery; Barham v. Widing (1930) 210 Cal. 206, 214-215 [291 P. 173], where a patient received an infection from unsterilized equipment.
Examples of when expert testimony was required, because complex or rare medical procedures required expert testimony to establish negli *495 gence follow: Huffman v. Lindquist (1951) 37 Cal.2d 465, 474 [234 P.2d 34, 29 A.L.R.2d 485], where there was a failure to diagnose a brain injury, and Farber v. Olkon (1953) 40 Cal.2d 503, 510-511 [254 P.2d 520], where a broken leg was suffered during electro-shock treatment in a mental hospital.
In Folk (1975) supra, 53 Cal.App.3d 176, the court stated (at pp. 185-186) that, “In our opinion, the etiology of brain abscesses and the standards of care prevailing in the medical community as concern tonsillectomies are not matters of common knowledge and therefore we are bound by expert testimony. It is not a matter of common knowledge that when a brain abscess begins to develop shortly after a tonsillectomy, the abscess probably was caused by negligence. Even among experts little is known about the causation of brain abscesses. Their nature is such that they are difficult to study. Since most brain abscesses originate in areas other than the throat (sinus passages, middle ear and lungs being the most common sources), and over a longer time, it is not even a common knowledge that the abscess was probably caused by the tonsillectomy, let alone ,that the abscess was probably caused by a negligently performed tonsillectomy.”.
Thus, it is clear that the present case is not one of those “simple” malpractice situations where a lay person could draw upon his own common sense to determine whether there was negligence. As stated in Folk, supra, when the alleged negligence concerns involved matters of treatment and diagnosis, expert witnesses must state their opinions on the matter, because only experts would ordinarily know the applicable standards of skill, knowledge and care prevailing in the medical community.
There can be no dispute, but that neither the question of causation between sinusitis and a brain abscess nor the question of the effect of the defendant’s failure timely to administer the culture and sensitivity test can be deemed a matter within the common knowledge of the average judge or juror. These types of judgment questions are just not the same inherent type as was involved in cases like Ales, supra, where a sponge was left in the patient after the operation.
Appellant cites eight cases which allegedly support his position that California would uphold the law as expressed in Helling (1974) supra, 83 Wn.2d 514. We disagree.
*496 The first case cited by appellant is that of Cobbs v. Grant (1972) 8 Cal.3d 229 [104 Cal.Rptr. 505, 502 P.2d 1]. There the court talked of a doctor’s duty of disclosure to his patient and the requirements of informed consent. This case lends no support to the appellant’s position that certain courses of treatment or diagnosis could therefore be found negligent as a matter of law. The duty of disclosure is vastly different from the duties involved in a course of medical diagnosis or treatment for an illness or disease.
Appellant also cites the case of Complete Serv. Bur. v. San Diego Med. Soc. (1954) 43 Cal.2d 201 [272 P.2d 497], This case is also not in point because it involved the issue of unprofessional conduct in advertising by physicians.
Four other of appellant’s cases are also not in point because they deal with the customs followed in industry and not in the field of medicine. In Gyerman v. United States Lines Co. (1972) 7 Cal.3d 488 [102 Cal.Rptr. 795, 498 P.2d 1043], the court talks of the standard of care to be employed by laborers in stacking sacks of fish meal in a warehouse. In Pauly v. King (1955) 44 Cal.2d 649 [284 P.2d 487], the topic of concern is the custom of roofers in standing on roofs. The case of Polk v. City of Los Angeles (1945) 26 Cal.2d 519 [159 P.2d 931], concerned the custom of tree pruners when there were electric wires present and the case of Owen v. Rheem Mfg. Co. (1947) 83 Cal.App.2d 42 [187 P.2d 785], discussed the industry practice of loading and shipping steel drums and barrels.
The courts in each of these cases noted that the issue which was involved concerned matters of common knowledge, and, as such, could be decided by ordinaiy judges and jurors without the aid of expert testimony. Basically, the rule that arises from these cases is that the applicable standard of care is not to be fixed by custom, but that the issue is always to be determined by the question: whether due care was exercised under all the circumstances of the case.
Thus, these four cases have no direct bearing upon our case. None of them states the applicable standard of care in a situation similar to the one confronting us. General industry customs and standards of care, for the most part, only require the use of common knowledge and, unlike most medical problems concerning treatment and diagnosis, do not require the introduction of expert testimony. The triers of fact in these cases only needed to rely upon their own common senses.
*497 The last two cases cited by the appellant deal with the customs of doctors. However, they concern issues of alleged negligence which are widely accepted as being within the common knowledge of lay persons. In Leonard v. Watsonville Community Hosp. (1956) 47 Cal.2d 509 [305 P.2d 36], the issue of negligence involved the leaving of a clamp in the patient’s abdomen after surgery. In the case of Ales v. Ryan (1936) 8 Cal.2d 82 [64 P.2d 409], the alleged negligence involved the leaving of a sponge in the patient after the operation.
The court in Leonard, supra, stated (at p. 519) that, “It is a matter of common knowledge, however, that no special skill is required in counting instruments. Although under such circumstances proof of practice or custom is some evidence of what should be done and may assist in the determination of what constitutes due care, it does not conclusively establish the standard of care.” In Ales (1936) supra, 8 Cal.2d 82, the court stated (at p. 97) that, “If a surgeon, undertaking to remove a tumor from a person’s scalp, lets his knife slip and cuts off his patient’s ear, ... or if a dentist in his haste, leaves a decayed tooth in the jaw of his patient and removes one which is sound and serviceable ... [i]t does not need scientific knowledge or training to understand that, ordinarily speaking, such results are unnecessary and are not to be anticipated if reasonable care be exercised by the operator.” The court went on further to say that, “ ‘... in most cases a layman can have no knowledge whether the proper medicine was administered or the proper surgical treatment given. Whether a surgical operation was unskillfully performed is a scientific question. If, however, a surgeon should lose the instrument with which he operates in the incision which he makes in his patient, it would seem as a matter of common sense that scientific opinion could throw little light on the subject.’ ”
Thus, we find that the basic thrust of the eight cases cited by the appellant are twofold. First, custom is not to be taken as the equivalent of due care, and second, there are exceptional times when a doctor’s alleged negligence may be judged by lay judges and jurors without the aid of expert witnesses. But, these cases have not established that the respondent was “negligent,” i.e., whether the custom he followed was lacking in due care. Furthermore, these cases have not shown that, in situations involving allegedly negligent medical treatment and diagnosis, such liability can be found without the need of expert testimony. For only then can this court on review find that there was or was not a breach of due care. If expert testimony must constitute the basis for any standard of due care, then there is raised a factual issue concerning the duty and its alleged breach, which must be decided by the triers of fact.
*498 It appears that the plaintiff can not find any case law to support his allegation except for the Washington case. It thus appears that, in calling for negligence as a matter of law, the plaintiff is in reality trying to get us to expand the concept of strict liability in tort to the services rendered by a doctor. (See Greenman v. Yuba Power Products, Inc. (1963) 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049].)
Justice Utter’s concurring opinion to Helling (1974) supra, 519 P.2d at pages 984-985, appears to point to this very idea of basing the respondent’s liability not upon negligence but rather upon strict tort liability. He states, “The difficulty with this approach [negligence] is that we as judges, by using a negligence analysis, seem to be imposing a stigma of moral blame upon the doctors who, in this case, used all the precautions commonly prescribed by their profession in diagnosis and treatment. Lacking their training in this highly sophisticated profession, it seems illogical for this court to say they failed to exercise a reasonable standard of care. It seem [sic] to me we are, in reality, imposing liability, because, in choosing between an innocent plaintiff and a doctor, who acted reasonably according to his specialty but who could have prevented the full effects of this disease by administering a simple, harmless test and treatment, the plaintiff should not have to bear the risk of loss. As such, imposition of liability approaches that of strict liability.”
However intriguing Justice Utter’s viewpoint may be, it is clear that, in California, strict tort liability does not extend to services. In Shepard v. Alexian Brothers Hosp. (1973) 33 Cal.App.3d 606 [109 Cal.Rptr. 132], the court said that strict liability should apply only where there has been a sale of a product and it is not to be applied only where services were rendered. (See Greenman v. Yuba Power Products, Inc. (1963) 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049].)
We thus disapprove of the Washington case of Helling v. Carey (1974) 83 Wn.2d 514 [519 P.2d 981]. It does not state the law in California. Also, a recent Washington case, Meeks v. Marx (1976) 15 Wn.App. 571 [550 P.2d 1158, 1162] has narrowed the Helling supra, decision by holding that, “A thorough analysis of that decision leads us to conclude the holding there was intended to be restricted solely to its own ‘unique’ facts, i.e., cases in which an opthalmologist is alleged to have failed to test for glaucoma under the same or similar circumstances.”
*499 We therefore hold that the issue of negligence was properly decided by the triers of fact, and that such issue could not. properly be found as a matter of law.
The appellant has not directly questioned the sufficiency of the evidence which was presented to the jury concerning the alleged negligence of the respondent in not “timely” giving the culture and sensitivity test to the plaintiff. However, we find that substantial evidence had been presented to the jury for them properly to have found that the defendant was not negligent as a matter of fact.
In Bancroft-Whitney Co. v. McHugh (1913) 166 Cal. 140, 142 [134 P. 1157], the court said that, “[I]n examining the sufficiency of the evidence to support a questioned finding, an appellate court must accept as true all evidence tending to establish the correctness of the finding as made, taking into account, as well, all inferences which might reasonably have been thought by the trial court to lead to the same conclusion. Every substantial conflict in the testimony is, under the rule which has always prevailed in this court, to be resolved in favor of the finding.” (See Overton v. Vita-Food Corp. (1949) 94 Cal.App.2d 367 [210 P.2d 757]; Buckhantz v. R. G. Hamilton & Co. (1945) 71 Cal.App.2d 777 [163 P.2d 756].)
The appellant aptly pointed out, in his own opening brief, that there was conflict between the various experts as to whether the standards of practice required that the appellant receive the test prior to February 29, 1972.
Dr. Wasserman testified that, in February of 1972, “[M]any people did cultures and many didn’t.” However, he went on to state that, based on plaintiff’s symptoms on February 11, he would have cultured on that date. Dr. Owen testified that it was not necessarily standard procedure to perform a culture and sensitivity test, but he acknowledged that some reputable otolaryngologists routinely would have used that procedure. Dr. Owen further stated that he had not given the test because the expense of it was not justified, other physicians would have acted similarly, that the medicines which he prescribed usually would have worked in a noncómplicated case and that it was appropriate to wait until the plaintiff’s condition had worsened.
Drs. Miller and Yarrington felt that it was not standard procedure to perform a culture and sensitivity test. Dr. Yarrington limited his testimony by stating that a culture is not usually performed in “routine” *500 and “noncomplicated” cases. Dr. Yarrington, a professor of medicine, stated that he teaches that performing a culture and sensitivity test is idealistic and desirable, but that most people just don’t do it.
Drs. Barton and Crabtree testified that the accepted standard of practice compelled performance of a culture and sensitivity test whenever a physician recognizes or suspects frontal sinusitis. There was also testimony by Dr. Barton that a culture and sensitivity test was the only method to reveal what was going on in the frontal sinus. He testified that proper treatment at an early stage might have made the difference. If the bacteria had been identified early, the proper antibiotic might then have killed it off before it led to the brain abscess. Dr. Crabtree testified that the longer you are exposed to an infection which can extend intercranially, the higher the probability is that there will be such an extension of the infection.
It should be noted that there also was evidence that the culture and sensitivity test did not, in and of itself, assure a proper diagnosis of the exact nature of the infection. This is illustrated by the fact that the test performed on February 29, 1972, showed the infecting organism to be staphylococcus aureus coagulase positive bacteria, whereas the test performed on a specimen of the brain tissue after surgery revealed a streptococcus bacteria. Thus, there was evidence that, even if the test had been performed earlier, it might not have led to the proper identification of the bacteria, and therefore it could be found by the jury that the failure to give the test at an earlier time was not the proximate cause of the plaintiff’s brain abscess. However, we do note that there was also expert testimony to the effect that the culture test given on February 29, 1972, might not have been accurate because the bacteria might have reacted before that date with some of the antibiotics that the plaintiff had been taking. In that case, the jury might well have found that, if the test had been given initially, it properly would have identified the bacteria so that the proper antibiotic could have been administered to the plaintiff.
It thus appears that the jury had substantial evidence upon which to decide that the respondent, Dr. Owen, was not negligent as a matter of fact for not submitting the appellant to a culture and sensitivity test prior to February 29, 1972.
(B) Plaintiff alleges that the trial court committed prejudicial error when it instructed the jury with respect to BAJI No. 6.03.[1] Plaintiff *501 alleges that the instruction was overly broad because it required the jury to find that the defendant was not negligent if he used a single approved diagnostic or treatment procedure even though the jury believed that he was negligent in not using others. Plaintiff further alleges that, as a matter of law, there existed only a single acceptable method of diagnosis, the culture and sensitivity test, and that therefore the giving of this instruction was improper because it allowed the jury to find some other method of diagnosis to also have been proper.
We have already stated that the culture and sensitivity test was not required to be administered to the plaintiff as a matter of law. Further, the jury did not find as a matter of fact that the test constituted the single acceptable method of diagnosis. Therefore, it was proper to charge the jury with respect to BAJI No. 6.03, because alternative methods of diagnosis and treatment existed with regard to the condition of the plaintiff.
Plaintiff contends, however, that, instead of categorizing the various diagnostic and treatment procedures according to their differing purposes and functions, BAJI No. 6.03 improperly combined them all in one pot and then the court basically told the jury that the defendant could not be found negligent so long as one of the approved procedures was selected. It is to be noted from the record that the purpose of the culture and sensitivity test was to identify the infecting bacteria, while X-rays and transillumination were used to measure the fluid and air levels in the sinuses.
We find that BAJI No. 6.03 calls only for the classification of medical procedures according to the two categories of diagnosis and treatment and that there is no requirement, as plaintiff alleges, that these categories further need be broken down so that only individual methods of diagnosis or treatment which serve the same identical purposes are compared.
BAJI No. 6.03 embodies the notion that different doctors may disagree in good faith upon what would encompass the proper treatment or diagnosis of a medical problem in a given situation. Medicine is not a field of absolutes. There is not ordinarily only one correct route to be *502 followed at any given time. There is always the need for professional judgment as to what course of conduct would be most appropriate with regard to the patient’s condition. Thus, BAJI No. 6.03 states the rule that where there are several methods of approved diagnosis or treatment, which could be made available to a patient, it is for the doctor to use his best judgment to pick the proper one.
Plaintiff contends, however, that if this is the test then a doctor could not be faulted for prescribing some very minimal treatment or diagnosis which could be proper but not adequate. The plaintiff is concerned that if the defendant had only prescribed nose drops to the plaintiff for his sinusitis he could not be faulted, because that was, in fact, a proper treatment. We disagree with plaintiff’s contention. For BAJI No. 6.03 contains several requirements to guard against such occurrences. First, the instruction requires that the doctor exercise his best judgment in following a given method. Therefore, he could be found negligent for not acting in good faith if he only were to prescribe some inconsequential method of diagnosis or treatment where more was clearly called for. Second, the instruction calls for the use of a “recognized” and “approved” method of diagnosis or treatment. A method only can be found to be “recognized” and “approved” in relation to the condition of the patient. For what may be an “approved” method in one situation might not be under other circumstances. A juiy well could find that it was not a “recognized” and “approved” method of treatment for sinusitis, to prescribe nose drops, whereas such a method of treatment might well be “approved” for simple nasal congestion. However, the juiy might find that the nose drops were proper as part of a recognized and approved overall course of treatment. Thus, properly to decide what is a recognized and approved method of diagnosis or treatment it is necessaiy to view the overall course of conduct followed by the doctor in connection with the circumstances of the patient’s condition. It is not proper just to pull bits and pieces out of each alternate course of conduct for comparison. It must be kept in mind that a method of diagnosis or treatment involves an entire course of conduct consisting of many potential steps. Although two courses of conduct may lead to the same end result, their individual steps may be totally dissimilar and incomparable. Thus, we should not compare individual steps to determine whether they serve the same purpose or functions as the plaintiff would have us do, but we should view the entire course of conduct that the doctor has chosen to follow, to see if it constitutes a “recognized and approved” method of diagnosis or treatment for the patient’s condition.
*503 Plaintiff also contends that BAJI No. 6.03 was defective, because it failed to distinguish between the mutually exclusive categories of diagnosis and treatment. Plaintiff contends that, instead of requiring both proper diagnosis and treatment, the instruction improperly required the jury to exonerate the defendant from any liability if he chose an approved method in either category. Thus, the plaintiff alleges that if the jury found that the defendant had selected an approved method of diagnosis, such as transillumination, the instruction given compelled that the defendant be found not liable even though the jury believed that his treatment procedures were negligent.
We disagree with the plaintiff’s contention. We acknowledge that both categories of diagnosis and treatment are distinct, but we conclude that the language of the instruction adequately precludes comparison between both of them. The language of BAJI No. 6.03 states that, “Where there, is more than one recognized method of diagnosis or treatment ....” Thus, the comparison of methods only is to be made between different methods of diagnosis or between different methods of treatment.
The plaintiff improperly claims that the comparison was to be made between merely “one of the approved methods” either of diagnosis or treatment. However, the word “either” does not appear in BAJI No. 6.03 so as to present any confusion.
For the reasons stated, we find that the trial court properly charged the jury with respect to BAJI No. 6.03.
(C) Plaintiff contends that the trial court committed prejudicial error when it instructed the jury on the “but for” rule of causation of BAJI No. 3.75, instead of the “substantial factor” rule of BAJI No. 3.76.
Plaintiff alleges that the “but for” test of causation is improper here because the plaintiff’s brain abscess could have resulted from the occurrence of any of two or more independently operating causes.
In Thomsen v. Rexall Drug & Chemical Co. (1965) 235 Cal.App.2d 775 [45 Cal.Rptr. 642], the court said that the “but for” rule of causation was inapplicable because it fails in the type of situation where several causes concur to bring about an event and either one of them operating alone would have been sufficient to cause the result.
*504 In Basko v. Sterling Drug, Inc. (2d Cir. 1969) 416 F.2d 417, 429, the court recognized the requirement that both of the forces causing injury need be independent. The court stated that the “but for” test will not work “... in the situation where two independent forces concur to produce a result which either of them alone would have produced.”
However, plaintifFs argument fails for one crucial reason. It is only held to be wrong to use a “but for” rule of causation when the various alleged causes of injury have resulted from the independent acts of different wrongdoers and not where one defendant has acted to bring about all of the alleged causes of injury.
The Restatement Second of Torts section 432(2) states the requirement that the independent causes must be the result of independent actors. The section states that, “If two forces are actively operating, one because of the actor’s negligence, the other not because of any misconduct on his part, and each of itself is sufficient to bring about harm to another, the actor’s negligence may be found to be a substantial factor in bringing it about.”
In our case it is clear that all of the alleged acts of negligence, which the plaintiff contends could have acted independently to cause his brain abscess, were solely caused by the defendant. There was no other independent actor. There was the failure timely to perform a culture and sensitivity test, the failure to take sinus X-rays before February 29, the inappropriate selection of antibiotics, the masking of the plaintiff’s symptoms by use of such inappropriate antibiotics, the failure to furnish any antibiotics to the plaintiff on two different occasions and the failure timely to make usage of available means of obtaining drainage, by way of a delay in removing the polyps, a delay in performing antrum irrigation, the failure to perform a trephination and the failure to apply cocaine packs.
It is clear that the “but for” test was proper here, because all of the alleged acts of negligence were caused by only one actor, the defendant. The acts were not the result of two or more independent actors, but, as the respondent states, they were only consecutive acts of treatment and care by the defendant.
Plaintiff also argues that when the trial court instructed the jury with respect to BAJI No. 3.75 it, “... improperly compelled the jury to find an absence of proximate causation unless it determined that there was a single cause or negligent act ‘without which the injury would not have *505 occurred.’ This forced the jury to ignore the evidence on which it could have found that multiple acts of negligence concurred as a substantial factor in producing the brain abscess. [1] Here, the jury could have determined that a combination of Dr. Owen’s negligent acts produced the harm, but that there was no single act without which the injury would not have occurred.”
Plaintiff’s reasoning fails us. There was no need for the jury to have found that “but for” a single cause or negligent act there would have been no injury. The jury could have found that “but for” all of the acts of the defendant there would have been no injury.
Furthermore, it appears that, if the substantial factor test had been used, the plaintiff would have had a harder case, because now one of the independent acts of the defendant would have had to be found, in and of itself, to be a substantial factor in causing the brain abscess. It seems that the jury would not have been allowed to find that all of the independent acts, when taken together, were a substantial factor leading to the brain abscess.
We find, accordingly, that the trial court did not err when it instructed the jury by giving BAJI No. 3.75.
(D) Plaintiff alleges that the trial court erred in charging the jury by giving BAJI No. 6.28[2] on contributory negligence. Plaintiff contends that there was no evidence that he was negligent and that .if there had been any negligence on the part of the plaintiff, it was not the proximate cause of his injury.
For the reasons set out below, we agree with the plaintiff’s claim that there was not sufficient evidence concerning his contributory negligence to support the trial judge’s charging of the jury with BAJI No. 6.28. We therefore reverse the judgment of the trial court.
“ ‘Contributory negligence is conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection, and which is a legally contributing cause co-operating with the negligence of the defendant in bringing about the plaintiff’s harm.’ ” *506 (See Gyerman v. United States Lines Co. (1972) 7 Cal.3d 488, 500 [102 Cal.Rptr. 795, 498 P.2d 1043].)
The court in Gyerman, supra, states that ordinarily it is a question of fact for determination by the triers of fact as to whether the plaintiff has been contributorily negligent. However, as stated in Preston v. Hubbell (1948) 87 Cal.App.2d 53, 61-62 [196 P.2d 113], where contributory negligence arises in a medical malpractice context there is need for the defendant to have offered expert testimony on the issue. Only experts can testify regarding the proximate effect of the plaintiff’s actions upon the aggravation of his condition. In much the same way that laymen are not qualified to judge whether a doctor has been negligent because of their lack of common knowledge on the subject, they also are not qualified from a medical standpoint to determine the effects of the “negligent” acts of the plaintiff. We note in passing that this might not always be the case. For when a doctor’s negligence is “obvious” to anyone as a matter of common sense, i.e., the leaving in of a sponge, so might there arise similar situations on the part of the plaintiff where his negligence is similarly “obvious.” However, no such situation has been shown here. In this case, no expert testimony has been brought to our attention, by either the appellant or the respondent, going towards proof that the plaintiff’s alleged negligence could have been the proximate cause, in whole or in part, of the plaintiff’s brain abscess.
Respondent states that there was evidence of contributory negligence on the part of the plaintiff, in that he had failed to call his doctor or his stand-in for several days while he was in pain, that he had failed to limit his strenuous outside activities, that he showed up at a Workers’ Compensation Appeals Board hearing while he was in pain, and that he had attended his daughter’s ballet while not feeling well.
Whether any or all of these acts constituted negligence is inconsequential. For there was no showing by any experts that any of these acts could medically have been the proximate cause of the plaintiff’s brain abscess.
The court in Preston (1948) supra, 87 Cal.App.2d 53, stated (at p. 62) with regard to the issue of contributory negligence, that, “Our attention has not been called to any evidence, and we have found none, that would have warranted a conclusion that the infection in plaintiff’s jaw was caused or aggravated by any failure on her part to comply with defendant’s instructions with respect to care and medication. Defendant was evidently of the same opinion. No instruction was given which embodied the facts pleaded by defendant. [H] Our conclusions as to the *507 harmful effect of the two specific instructions may be stated briefly: the questions whether the delay of a week or 10 days to secure further medical attention caused or aggravated the infection, and whether more prompt treatment would have obviated the operation, were for physicians and not laymen. Defendant, having the affirmative of the issue offered no evidence thereon. Plaintiff, having nothing to rebut, offered none. The jury had nothing to serve as a guide in deciding these questions and a conclusion adverse to plaintiff upon this issue would have been unsupported by any evidence.. .. The error in the instructions was obviously prejudicial.”
In Maertins v. Kaiser Foundation Hospitals (1958) 162 Cal.App.2d 661, 667 [328 P.2d 494, 75 A.L.R.2d 807], the court stated in a medical malpractice case that, “Even where plaintiff’s negligence is proved it must be a proximate cause of the injuries to be a defense.” The court went on to say that, as in Preston, supra, it was, “. . . error to instruct the jury that they might consider plaintiff’s delay in securing medical attention where there was no evidence that ‘more prompt treatment would have.obviated the operation.’ ”
Thus, there was prejudicial error committed by the trial court in the improper charging of the jury with regard to contributory negligence. There was no evidence in the record, expert or not, that any of the allegedly negligent acts of the plaintiff were the proximate cause of his brain abscess. As set forth in Henderson v. Harnischfeger Corp. (1974) 12 Cal.3d 663, 670-671 [117 Cal.Rptr. 1, 527 P.2d 353], “Generally speaking if it appears that error in giving an improper instruction was likely to mislead the jury and thus become a factor in its verdict, it is prejudicial and ground for reversal. [Citations.] To put it another way, ‘[wjhere it seems probable that the jury’s verdict may have been based on the erroneous instruction prejudice appears and this court “should not speculate upon the basis of the verdict.” ’ [Citations.]”
The reading of BAJI No. 6.28 resulted in a miscarriage of justice because we are unable to ascertain from the record whether or not the jury found that the defendants were free from negligence or whether they found that the defendants were negligent, but, based on the erroneous instruction, that plaintiff was guilty of contributory negligence. Therefore, we must reverse the decision of the lower court. (See Robinson v. Cable (1961) 55 Cal.2d 425, 428 [11 Cal.Rptr. 377, 359 P.2d 929] where the same type of error led to a reversal.)
*508 (E) Plaintiff lastly alleges on appeal that the trial court erred in limiting the scope of his voir dire examination of the jury concerning the medical malpractice crisis, and in refusing to admonish or instruct the jury not to consider such publicity in deciding the case.
The purpose of the voir dire is to select a fair and impartial jury. (See People v. Crowe (1973) 8 Cal.3d 815 [106 Cal.Rptr. 369, 506 P.2d 193].) Although the trial judge may set reasonable limits on the examination, he should permit “liberal and probing examination calculated to discover possible bias or prejudice. . . .” (See Standards Jud. Admin., § 8(A)(1).)
We find, however, that the trial judge properly used his discretion to limit the voir dire in this case. The proposed voir dire question[3] would have injected into the present case unnecessary emphasis upon the subject of “malpractice insurance.” As stated in Sweet v. Stutch (1966) 240 Cal.App.2d 891, 893 [50 Cal.Rptr. 9], misconduct and error arise when, “. .. the questions are designed to implant in the minds of the jury the fact that the defendants are insured.” Clearly, this might have been the result of the plaintiff’s intended voir dire question. For it is likely that the panel would have surmised that the plaintiff was discussing the overall medical insurance crisis only because the defendant was similarly insured.
If the plaintiff had only wished to determine whether any members of the panel were biased or prejudiced towards plaintiffs in malpractice cases, that might have been a proper line of questioning.
The plaintiff’s requested admonition[4] to the jury was also properly denied by the trial judge. It also had injected within it several harmful references to the medical malpractice insurance crisis. From these *509 references, it was highly possible that the jury would have guessed that the defendant was so insured. The plaintiff’s proposed admonition would have been proper if it had limited the jury’s consideration to the evidence received into open, court and the court’s instructions, and not upon any outside statements: or influences.
The judgment in favor of Dr. Wasserman is affirmed; the judgment in favor of Dr. Owen is reverse d. Dr. Wasserman shall recover his costs as against plaintiff; plaintiff shall recover his costs as against Dr. Owen.
Dunn, J., concurred.

“Where there is more than one recognized method of diagnosis or treatment, and no *501 one of them is used exclusively and uniformly by all practitioners of good standing, a physician and surgeon is not negligent if, in exercising his best judgment, he selects one of the approved methods, which later turns out to be a wrong selection, or one not favored by certain other practitioners.”

“It is the duty of a patient to follow all reasonable and proper advice and instructions given him by his doctor regarding the patient’s care, activities and treatment. A doctor is not liable for any injury proximately resulting from the negligent failure of the patient to do so. Such failure, however, does not relieve a doctor of responsibility for any injury resulting solely from any malpractice on his part.”

Plaintifif asked whether any members of the panel had “recently . . . read in the paper or in magazines or listened on the radio or seen and heard on television any discussion with regard to this type of lawsuit, called medical negligence or medical malpractice. . . .”

Plaintiff's requested special jury instruction No. 1: “If any one or more of you have watched, read, or heard any material in any media, whether newspaper, magazine, radio, television, or otherwise, dealing with a so-called malpractice crisis or problem, you are instructed that you must not consider or discuss any such material in your deliberations. It would be a violation of your oath as jurors in this matter to consider, discuss, or in any way allow statements dealing with a so-called malpractice crisis or problem to affect your decisions as to the triers of fact in this case. You must make your determinations as the triers of fact based solely and exclusively upon the evidence produced during this trial, and without any influence from statements in the news media.”