[Civ. No. 40461. First Dist., Div. One. Mar. 21, 1978.]

SOLOMON CONTRERAS, Plaintiff and Appellant, v.
ST. LUKE'S HOSPITAL et al., Defendants and Respondents.

## COUNSEL

John E. Milonas and Arthur D. Dempsey for Plaintiff and Appellant.

Crosby, Heafey, Roach & May, Robert K. Crawford, Herbert I. Pierce III, Hassard, Bonnington, Rogers & Huber, Glenn L. Allen, B. Thomas French and Charles F. Bond II for Defendants and Respondents.

## OPINION

**CALDWELL, J.\***—Plaintiff Solomon Contreras brought an action for damages for medical malpractice against defendants St. Luke's Hospital and Carl E. Borders, M.D. The action was based on asserted negligence by defendants relating to surgery on plaintiff's knee and a post-operative knee infection. Plaintiff now appeals from a judgment in favor of both defendants made pursuant to an order of the trial court granting defendants' motions for nonsuit.

At trial plaintiff presented only three witnesses, namely, himself, his wife, and one medical witness, Etidal Tadros, M.D., who had been employed by the hospital as an intern but who did not participate in the operation. Various hospital records were received in evidence. The evidence, stated most favorably to plaintiff, is as follows:

On August 30, 1970, plaintiff fell while water skiing, twisting his leg and tearing the medial collateral ligament in his right knee. He went to the St. Luke's Hospital emergency ward that evening. X-rays disclosed no broken bones, but plaintiff was told to see a doctor. Plaintiff consulted four doctors, including Dr. Borders, and expressed a reluctance to have an operation, indicating that he would prefer to have a cast. All four of the doctors told plaintiff either that he had to have an operation or that it would be better to have an operation.

Plaintiff selected Dr. Borders to perform an operation. In discussing the matter before the operation, Dr. Borders told plaintiff that he would be able to leave the hospital in three days. Plaintiff would not have consented to surgery if hospitalization would last for more than one week. Both Dr. Borders and Dr. Gill, an associate of Dr. Borders,

*Assigned by the Chairperson of the Judicial Council.

explained the complications of surgery to plaintiff including "the possibility of infection." Dr. Borders stated: "Oh, there is rarely an infection and this is one out of a hundred. . . . In one out of a hundred operations, infection was one of the complications. . . ." Plaintiff replied: "Doctor, you say it's one out of a hundred. Then I'm not going to be the one."

Plaintiff was admitted to St. Luke's on September 1, 1970, and he signed papers consenting to surgery and to the administration of anesthetics. The operation was performed by Dr. Borders at St. Luke's on September 3, 1970. The hospital records contain an "operative record" signed by Dr. Borders as of that date stating among other things that the medial collateral ligament "had detached itself from the undersurface of the superficial portion proximally. . .," that "[t]here was one small rent in the synovium just above the cartilage," that "[T]here was some significant tearing on anterior, medial, and posterior portions of this portion of the ligament; and it was completely separated from its proximal attachment," that these tears were all repaired, and that a "long-leg cast" going from his foot to his thigh was applied. Plaintiff remained in the hospital until October 13, 1970, when he was discharged on crutches.

The technical aspects of what occurred after the operation were evidenced solely by the hospital records and by the testimony of Dr. Tadros, who had no independent recollection of the events and who testified on the basis of her own notes and other portions of the hospital records.

On the second day after the operation plaintiff complained of severe pain in his knee, and he also complained of frequency of urination and burning urination. Dr. Gill, acting for Dr. Borders, had left instructions for the nurses to call the doctor on duty if plaintiff's temperature should rise. On September 5, 1970, plaintiff's temperature rose to 39.2 centigrade (average normal being 36.7 to 37.5), and Dr. Tadros was called, arriving two hours after the temperature rise. She did not see plaintiff before or after this one visit. Because of plaintiff's complaints and a prior urinary infection Dr. Tadros had the "impression," not a "diagnosis," of a possible wound infection or urinary tract infection, and she ordered that laboratory tests be made. As a result of this examination, considered together with negative laboratory test reports returned at a later date, Dr. Tadros concluded at trial that plaintiff had neither type of infection on September 5. Dr. Borders on September 6, 1970, entered a statement on

the patient's history sheet to the effect that there was no evidence of infection of the knee and that the temperature "yesterday" was 100.4, probably due to "postoperative atelectasis which would not occur in more cooperative patient." On September 7 he noted: "Temp. 37.5. . . urine culture not yet back, doubt any serious infection, cast windowed & no evidence of infection. . . ." and, in a later note that day, "urine culture neg. . . ."

On September 8 plaintiff's temperature was 38○ C., and his knee was aspirated by Dr. Borders, i.e., fluid was withdrawn by use of a needle and syringe for testing. The liquid was cloudy and yellow. A smear test, apparently completed the same day, was negative.

On September 9 Dr. Borders wrote on the history sheet that plaintiff was very confused, refusing pain pills, and apparently having hallucinations. Dr. Tadros testified that she did not see any relationship between the hallucinations and the knee infection, that the knee infection was not "clinically apparent" on the 9th of September, and that to determine the cause of the hallucinations she would have to see what medications he was taking. Dr. Borders reported in his hospital "discharge summary" dated November 13, 1970, that plaintiff apparently had a reaction from his "Talwin," which caused the hallucinations. A hospital "medication" sheet shows that plaintiff had been given "Talwin" for pain on September 8 at 11:30 p.m.

On September 10, Dr. Borders wrote in the history sheet: "12 noon. Patient culture this a.m. now growing gram-positive bacteria. Knee aspirated—20 cc. cloudy fluid."

On that day plaintiff, with his consent, was taken to the operating room, incision was made under a general anesthetic, cloudy yellow fluid and fibrin clots were removed, the wound was irrigated, an input tube and an output suction tube were placed, and a new cast was applied. At this time no "gross pus" was found but the area was described as "infected," "infectious," and indicating "pyarthrosis." There is nothing to show that any of the prior repair work was altered.

The laboratory reported on September 11 that with respect to the knee fluid there was "gram-positive cocci—identification pending," and on September 12 or 13 a further report was issued reading "Culture-Rare Hemolytic Enterococci." Dr. Tadros testified that, particularly because the cocci was "rare," it was normal for the laboratory to take extra time

to identify the type. Dr. Tadros defined "enterococcus" as being a normal inhabitant in the bowel but a cause of infection if present in other areas such as in a knee wound.

With the possible exception of a very minor urinary tract infection on September 17, which, according to Dr. Tadros, was entirely different from the enterococci in the wound, there is nothing to indicate that anything unusual took place between September 10 and the date of plaintiff's discharge from the hospital. When Dr. Tadros was asked whether it was usual for a person to remain in the hospital so long after an operation for a torn ligament she replied, "This man had an infection." She also testified repeatedly that in her opinion the required standards of care were met in this case.

The testimony of plaintiff as to the events in the hospital is in large part consistent with the evidence set forth above. Plaintiff was uncertain as to the dates when some of the things took place. The doctor saw him every other day, but there were five or six days in which the cast was completely closed and there was no way to check the wound. He was sleeping a lot because of the pills, couldn't recognize anybody, and did not know whether the doctor came or not. Upon his complaints of pain the doctor at first refused to loosen the cast but finally did so at plaintiff's request, but this didn't help much and the pain continued. He kept calling for the doctor, but he didn't see the doctor, the nurses kept giving him pills, and he started getting hallucinations. Plaintiff complained to his wife, and both of them threatened to dismiss Dr. Borders and to leave the hospital. At one time there was a guard on plaintiff's door to be sure he could not go out. He had an ingrown toenail that was hurting him, he called the nurses but nobody helped him, and finally he called his wife, who cut the nail for him. After the second operation the fever went down and plaintiff was getting relief. It was a long time after the cast was removed before he could move his knee.

After plaintiff was released he asked Dr. Borders what caused the infection, and Borders said: "Well, it's either three things: Either a glove or a tool that wasn't well sterilized or a defective mask and one of the persons that was operating breathed into it." At some time after plaintiff left the hospital, Dr. Borders and another doctor told plaintiff he needed another operation.

Plaintiff's wife also testified as to some of the things related by plaintiff. In addition she testified that on one occasion she asked a nurse

to remove a bedpan that plaintiff was using, which was smelling terribly, that the nurse said we'll be there in a minute, and that the minute never came. Later, when asked about it, the nurse said, "I'm sorry, we're understaffed because we are moving to the new hospital." At that time plaintiff's leg was in a cast from his groin down. His wife further testified that plaintiff complained of pain, fever, hallucinations, and the treatment by the nurses, and that Dr. Borders looked nervous when he learned from the records that plaintiff had taken "70 Demerols, pain killers . . . in one week."

■ A nonsuit or a directed verdict may be granted only when, disregarding conflicting evidence, giving to plaintiff's evidence all the value to which it is legally entitled, and indulging in every legitimate inference which may be drawn therefrom in favor of plaintiff, the result is a determination that there is no evidence of sufficient substantiality to support a decision in his favor. (*Estate of Lances* (1932) 216 Cal. 397, 400 [14 P.2d 768]; see 4 Witkin, Cal. Procedure (2d ed. 1971) pp. 3152-3153.)

The evidence presented by plaintiff clearly permits a reasonable inference that serious infection developed in plaintiff's knee sometime during or shortly after the operation on September 3, 1970, and that as a direct consequence of the infection plaintiff suffered damages in that he had to undergo a second operation and further treatment, including approximately a month's additional hospitalization, which would not have been required in absence of the infection.

The record discloses no other possible basis for recovery of damages in this case. It does not appear that the actual repair work performed on September 3 was inadequate or defective or that it was in any way altered by the second operation of September 10, nor is there anything to indicate that the second operation was improperly performed. In fact, plaintiff testified that immediately after this second operation his fever went down and he was getting relief from his discomforts. Although plaintiff was told after his release from the hospital that he should have an additional operation, there is no evidence that this condition resulted from the prior treatment or that it was in any way caused by negligence upon the part of defendants. Moreover, aside from the infection and its consequences, there is no evidence that the extent of plaintiff's disability or the length of his recovery period was abnormal. In this connection, as stated above, Dr. Tadros, when asked whether plaintiff's stay in the hospital was unusually long, replied: "This man had an infection."

■ The basic question for our determination, therefore, is whether there is sufficient substantial evidence to permit a conclusion that plaintiff's knee infection was proximately caused or increased or unduly prolonged by negligence upon the part of defendants or either of them. ■ In considering this matter we must keep in mind the general rules prevailing in medical malpractice cases that a physician is required to possess and exercise, in both diagnosis and treatment, that reasonable degree of knowledge and skill which is ordinarily possessed and exercised by other members of his profession in similar circumstances and that the standard of care against which the acts of a physician are to be measured is a matter peculiarly within the knowledge of experts and can be proved only by their testimony, unless the conduct required by the particular circumstances is within the common knowledge of the layman. (*Landeros* v. *Flood* (1976) 17 Cal.3d 399, 408-410 [131 Cal.Rptr. 69, 551 P.2d 389]; *Sinz* v. *Owens* (1949) 33 Cal.2d 749, 753 [205 P.2d 3, 8 A.L.R.2d 757].) Similar rules apply regarding the care to be given by a private hospital to its patients. (*Rice* v. *California Lutheran Hospital* (1945) 27 Cal.2d 296, 299 [163 P.2d 860]; *Valentin* v. *La Societe Francaise* (1946) 76 Cal.App.2d 1, 6 [172 P.2d 359].)

■ Plaintiff contends that defendants inadequately informed him of the risks of surgery and the alternatives available and that, therefore, his formal consent to the first operation was invalid. He relies upon *Cobbs* v. *Grant* (1972) 8 Cal.3d 229, 243 [104 Cal.Rptr. 505, 502 P.2d 1], where it was held that a physician has a duty to his patient "of reasonable disclosure of the available choices with respect to proposed therapy and of the dangers inherently and potentially involved in each." A breach of this duty which causes injury to the patient may justify an action pleaded in negligence. (*Cobbs* v. *Grant, supra,* 8 Cal.3d at pp. 241, 245.)

In our opinion plaintiff's testimony reveals that there was sufficient compliance with the disclosure rule when Dr. Borders and Dr. Gill informed plaintiff of "the complications of surgery," that there was a possibility of infection, and that infection occurred in one out of a hundred operations. As pointed out in *Cobbs,* "the patient's interest in information does not extend to a lengthy polysyllabic discourse on all possible complications," and "[a] mini-course in medical science is not required; . . ." (8 Cal.3d 229 at p. 244.) Also, the doctor has no duty to discuss "the relatively minor risks inherent in common procedures, when it is common knowledge that such risks inherent in the procedure are of very low incidence." (8 Cal.3d at p. 244.) In the present case plaintiff was informed of the specific peril that resulted in damage to him, namely

infection, and the risk was of a very low incidence, i.e., one out of a hundred. It is a matter of common knowledge that infections may have serious consequences and at times are stubbornly resistant to treatment, and, under all the circumstances, contrary to plaintiff's assertion, the doctor was not required to calculate and give information as to how long plaintiff might have to be hospitalized or as to what specific treatment might be required in the unlikely event that an infection occur. Whereas plaintiff had the burden of going forward with evidence of nondisclosure (8 Cal.3d at p. 245), the record contains no evidence that there were any feasible alternative treatments or choices available which Dr. Borders could have disclosed. It seems most unlikely that use of a cast without an operation, as suggested by plaintiff, would have succeeded in repairing his "completely separated" and "detached" ligament. Plaintiff has not produced expert medical testimony that any alternatives to an operation were feasible or that a skilled practitioner of good standing would have provided additional information under similar circumstances or that plaintiff would have consented to the use of a cast alone if informed of all the consequences of such use. (Cf. *Morgenroth* v. *Pacific Medical Center, Inc.* (1976) 54 Cal.App.3d 521, 534-535 [126 Cal.Rptr. 681]; *Cobbs* v. *Grant, supra,* 8 Cal.3d 229, 245.)

Plaintiff asserts that Dr. Borders falsely informed him that he would be out of the hospital in three days, and he points to his own testimony that he would not have consented to surgery if he had known that the hospitalization would last for over a week. It is obvious, however, that the reference by the doctor to a three-day period was not intended to cover any additional confinement necessitated by the unexpected occurrence of an infection, and there is no evidence that plaintiff's hospitalization would have endured for more than three days if the infection had not occurred. When plaintiff replied, after being warned about infection, "Doctor, you say it's one out of a hundred. Then I'm not going to be the one," he showed recognition of the fact that an infection might develop.

There is no expert testimony to the effect that the presence of pain and fever after plaintiff's knee operation pointed to the existence of a knee infection or to negligence by defendants under the circumstances of this case, and these matters are obviously not within the common knowledge of laymen. Although the possibility of an infection was considered by Dr. Tadros as early as September 5, 1970, the only expert evidence with respect to the situation on that date is her testimony that, in view of the subsequent negative laboratory report, no infection existed then. Entries in the hospital record between September 5 and September 9, as stated

above, disclose that further consideration was being given to the possibility of infection but that plaintiff's temperature had gone down to normal or nearly normal. The fact that plaintiff had hallucinations on September 9 is not shown by any medical testimony to have had a connection with the knee infection, and the matter is certainly not one of common knowledge. As noted in Dr. Borders' discharge summary referred to above, the hallucinations could have resulted from a reaction by plaintiff to the "Talwin" given to him for pain on the previous night, and the propriety of administering such a substance and the question whether plaintiff's hallucinations were caused by it or by something else clearly required expert evidence. The only such evidence was the testimony of Dr. Tadros, who declared that she could see no relationship between the hallucinations and the infection.

On September 10 it appeared from a laboratory report that a culture prepared with fluid taken from plaintiff's knee was "growing gram-positive bacteria," and Dr. Borders on the same day performed the second operation referred to above without waiting for the final laboratory analysis completed a day or two later. The entire sequence of events together with the testimony that Dr. Borders saw plaintiff only every other day and that the cast remained completely closed for five or six days so that there was no way to check the wound, might permit an inference that the infection was not discovered at the earliest possible date. ▆▆ However, the questions whether defendants acted with sufficient promptness under the applicable standards of medical care to discover and treat the infection and whether the course of treatment they followed was proper are not matters within common knowledge, and plaintiff produced no expert medical testimony thereon aside from that of Dr. Tadros who, as we have seen, testified that all ordinary standards and practices were followed.

Plaintiff contends that negligence was established by the testimony of himself and his wife that a nurse told them that the hospital was understaffed because of a pending move to a new hospital. As said above, however, this statement was given as an explanation of a delay in removing a bedpan which plaintiff had been using, and there is no evidence that this delay or the understaffing had any connection with the infection. Similarly, there is nothing to indicate that the failure of the nurses to trim plaintiff's ingrown toenail had anything to do with the infection.

Plaintiff contends, finally, that the evidence presented to the trial court is sufficient to support a judgment in his favor under the doctrine of res ipsa loquitur. The doctrine is set forth in its most simple and direct form in *Zentz* v. *Coca Cola Bottling Co.* (1952) 39 Cal.2d 436, 446 [247 P.2d 344], where the court said: "[A]s a general rule, res ipsa loquitur applies where the accident is of such a nature that it can be said, in the light of past experience, that it probably was the result of negligence by someone and that defendant is probably the person who is responsible. In determining whether such probabilities exist with regard to a particular occurrence, the courts have relied both upon common knowledge and the testimony of expert witnesses, and they have considered the circumstances relating to the accident in each particular case, such as the extent of control exercised by the defendant, the plaintiff's own conduct, the likelihood of negligence by some third person, and in some situations, evidence that the defendant is better able than the plaintiff to explain what happened." (See also *Newing* v. *Cheatham* (1975) 15 Cal.3d 351, 359-360 [124 Cal.Rptr. 193, 540 P.2d 33].)

The doctrine is frequently used in malpractice cases against doctors and hospitals, where the courts apply a combination of the general rules set forth above relating to res ipsa loquitur and those concerning the establishment of the standards of care to be applied as to medical and surgical matters, including the need for expert testimony on matters not within the common knowledge of laymen. (See *Bardessono* v. *Michels* (1970) 3 Cal.3d 780, 788 et seq. [91 Cal.Rptr. 760, 478 P.2d 480, 45 A.L.R.3d 717]; *Davis* v. *Memorial Hospital* (1962) 58 Cal.2d 815, 817 [26 Cal.Rptr. 633, 376 P.2d 561]; *Ybarra* v. *Spangard* (1944) 25 Cal.2d 486, 489 et seq. [154 P.2d 687, 162 A.L.R. 1258] [doctrine applied to several defendants although no showing that any particular defendant caused the injury].)

The evidence produced by plaintiff shows compliance with some of the factors or tests which are to be considered in res ipsa loquitur cases. For example, it may reasonably be inferred here that plaintiff's own conduct did not contribute to causing or prolonging the infection. Also, defendants were in control of the events that took place and were in a better position to explain what occurred.

The evidence, however, does not establish the basic requirement of the res ipsa loquitur rule, namely, that the occurrence complained of must be of such a nature that it probably was the result of negligence by defendants. Plaintiff produced no expert testimony to the effect that a

knee infection after an operation of the type involved here does not ordinarily occur in the absence of negligence. Although we may assume in accordance with the statement of Dr. Borders to plaintiff that an infection occurs in only one out of a hundred such cases, the fact that a harmful consequence is rare does not, in itself, establish a probability that when such a rare event does occur, it is the result of negligence by the defendants. (*Cobb* v. *Grant, supra,* 8 Cal.3d 229, 237; *Siverson* v. *Weber* (1962) 57 Cal.2d 834, 839 [22 Cal.Rptr. 337, 372 P.2d 97]; *Salgo* v. *Leland Stanford etc. Bd. Trustees* (1957) 154 Cal.App.2d 560, 571 [317 P.2d 170]; *Schnear* v. *Boldrey* (1971) 22 Cal.App.3d 478, 485 [99 Cal.Rptr. 404]; *Clemens* v. *Regents of University of California* (1970) 8 Cal.App.3d 1, 11-12 [87 Cal.Rptr. 108]; see *Clark* v. *Gibbons* (1967) 66 Cal.2d 399, 412 [58 Cal.Rptr. 125, 426 P.2d 525].) Moreover, it is not a matter of common knowledge that an infection subsequent to an operation of the type involved here is more likely than not the result of negligence by the surgeon or the hospital, and, in the absence of expert testimony on the matter we cannot properly hold that there is such a probability.

Our conclusion is directly supported by two decisions in other jurisdictions which held that res ipsa loquitur is not applicable merely because an infection develops after surgery to repair a broken leg or shoulder. (*Smith* v. *Curran* (1970) 28 Colo.App. 358 [472 P.2d 769, 770-772]; *Montana Deaconess Hospital* v. *Gratton* (1976) 169 Mont. 185 [545 P.2d 670, 673].) There are also a number of analogous decisions reaching a similar result where infections have ensued after various types of operations. (Cf. *Pink* v. *Slater* (1955) 131 Cal.App.2d 816, 818 [281 P.2d 272] [infection after plastic surgery]; *Folk* v. *Kilk* (1975) 53 Cal.App.3d 176, 185 et seq. [126 Cal.Rptr. 172] [brain abscess following tonsillectomy]; *McCall* v. *St. Joseph's Hospital* (1969) 184 Neb. 1 [165 N.W.2d 85, 88-89] [staphylococcus infection after surgery for herniated disc]; *Schofield* v. *Idaho Falls Latter Day Saints Hosp.* (1965) 90 Idaho 186 [409 P.2d 107, 109] [eye infection after operation to remove cataract]; *Harmon* v. *Rust* (Ky. 1967) 420 S.W.2d 563, 564 [infection following skin grafts for burns]; see discussion in *Barton* v. *Owen* (1977) 71 Cal.App.3d 484, 494 et seq. [139 Cal.Rptr. 494], relating to a brain abscess, of what matters may be regarded as within common knowledge of laymen.)

It should be noted that if, as set forth in the hospital records introduced by plaintiff, the infection was indeed a "rare" type of enterococci, it would be even more difficult to reach a conclusion that its

cause or late discovery, if true, was probably the result of negligence by defendants.

California courts have stated that it is a matter of common knowledge among laymen that *injections* in the arm as well as in other portions of the body do not ordinarily cause trouble unless unskillfully done or unless there is something wrong with the serum. (*Bardessono* v. *Michels, supra,* 3 Cal.3d 780, 788 et seq.; *Wolfsmith* v. *Marsh* (1959) 51 Cal.2d 832, 835 [337 P.2d 70]; *Bauer* v. *Otis* (1955) 133 Cal.App.2d 439, 443-445 [284 P.2d 133].) The cases cited, however, are clearly distinguishable because they did not involve operations where a considerable area of tissue was necessarily exposed and because in each case it appeared that the injury was due to an improper insertion of the needle rather than to a consequent infection.

*Davis* v. *Memorial Hospital* (1962) 58 Cal.2d 815 [26 Cal.Rptr. 633, 376 P.2d 561], which involved an abscess formed after the giving of an enema, must also be distinguished because in that case there was specific medical testimony that the insertion of the enema tube caused a break in the mucous membrane which started the abscess. In *Barham* v. *Widing* (1930) 210 Cal. 206 [291 P. 173], the court affirmed a judgment for damages against a dentist where a serious infection followed a tooth extraction, but there the court relied upon the testimony of a physician that the seat of the infection was not the socket of the tooth but rather the very point where a hypodermic needle had been inserted and that in his opinion the infection was caused by an unsterile needle or solution or a failure to sterilize the place of insertion. The court did not discuss the question considered in the more recent cases of whether, in the rare case where a harmful result does occur, a negligent cause is more probable than a nonnegligent one.

Plaintiff cites *Clark* v. *Gibbons, supra,* 66 Cal.2d 399, 412, in which it was said: "[P]roof that when due care is exercised an injury rarely occurs, accompanied by other evidence indicating negligence, may be sufficient to warrant an instruction on conditional res ipsa loquitur." (Cf. also *Quintal* v. *Laurel Grove Hospital* (1964) 62 Cal.2d 154 [41 Cal.Rptr. 577, 397 P.2d 161].) The case is not in point, however, because, as we have seen, the evidence presented by plaintiff here does not show any specific negligent act or omission of a type which could have caused the damage suffered by plaintiff.

Plaintiff cites a number of other cases as applying the rule noted above that the doctrine of res ipsa loquitur may be available even in the absence of expert testimony, i.e., when under the circumstances of the particular case the existence of negligence is within the realm of common knowledge. (E.g., *Meier* v. *Ross General Hospital* (1968) 69 Cal.2d 420 [71 Cal.Rptr. 903, 445 P.2d 519]; *Leonard* v. *Watsonville Community Hosp.* (1956) 47 Cal.2d 509 [305 P.2d 36]; *Ybarra* v. *Spangard, supra,* 25 Cal.2d 486.) These decisions are in accord with the general principles we have already discussed, but they are not helpful on their facts because they do not relate to infections or to what conduct may reasonably be expected of a doctor or hospital concerning infections or to what knowledge laymen may have on this subject.

Plaintiff contends that negligence, or at least the applicability of res ipsa loquitur, was established by Dr. Borders' statement to him that the infection was caused by "either of three things: Either a glove or a tool that wasn't well sterilized or a defective mask and one of the persons that was operating breathed into it." Assuming, without deciding, that this out-of-court admission, which was received in evidence without objection, may properly be considered as substantial evidence against both defendants, we nevertheless conclude that it is insufficient, without more, to show negligence. ■ As held in *Lashley* v. *Koerber* (1945) 26 Cal.2d 83, 89-90 [156 P.2d 441], "an extrajudicial statement amounting to no more than an admission of bona fide mistake of judgment or untoward result of treatment is not alone sufficient to permit the inference of breach of duty; the statement 'must be an admission of negligence or lack of skill ordinarily required for the performance of the work undertaken.' [Citation]." (See also *Cobbs* v. *Grant, supra,* 8 Cal.3d 229, 237-238.) Plaintiff has submitted no evidence that the methods of sterilization and inspection or other procedures followed by defendants were not in accord with the standards of care usually and reasonably followed by doctors and hospitals under similar circumstances; nor is there evidence that procedures ordinarily considered safe and effective are capable of detecting and rendering harmless all defective equipment or all infectious material. Defendants, of course, are not insurers against the possibility an unsterile tool or an infectious substance might escape a reasonable inspection, and this is particularly true in a case such as the present where the only expert evidence on the subject is that the type of infection acquired by plaintiff was "rare." Also, as we have seen, these matters are not within the common knowledge of laymen.

Although plaintiff could have established a prima facie case by presenting expert testimony that in the rare situation where a post-operative knee infection does occur, it probably resulted from negligence by the doctor or the hospital staff, he did not do so. It may be noted, in this connection, that the many questions asked of Dr. Tadros did not include a question on this subject nor did plaintiff make any offer of proof on the matter.

It follows from what we have said that the trial court did not err in granting defendants' motions for nonsuit.

The judgment is affirmed.

Racanelli, P. J., and Elkington, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 18, 1978. Bird, C. J., and Mosk, J., were of the opinion that the petition should be granted.