[Civ. No. 3416. Fifth Dist., Sept. 14, 1979.]

SUSAN CAROL BOLEN, Plaintiff and Appellant, v.
DANIEL WOO, Defendant and Respondent.

**COUNSEL**

Fullerton, Lang, Richert & Patch and Jeff Wall for Plaintiff and Appellant.

McCormick, Barstow, Sheppard, Coyle & Wayte and Lawrence E. Wayte for Defendant and Respondent.

## OPINION

**DAVIS, J.**[*]—Plaintiff and appellant, Susan Carol Bolen, sued defendant and respondent, Dr. Daniel Woo, for medical malpractice. At the conclusion of the four-day trial the jury, on a nine-to-three vote, returned a verdict in favor of respondent.

On appeal, appellant claims that the trial court committed prejudicial error in instructing the jury on the issue of contributory negligence. She also asserts that it was error for the trial court to refuse to instruct the jury on the doctrine of res ipsa loquitur. Finally, she alleges that the court improperly ruled that Civil Code section 3333.1 should be applied retroactively.

Appellant was in the eighth grade when she first was seen by respondent in April of 1971 concerning a problem with her right heel. At that time he diagnosed her condition as a callous over the Achilles tendon and prescribed hot water soaks and supportive care. Appellant was next seen by respondent on January 27, 1972. At that time he diagnosed her condition as a "fat tumor" in the right Achilles area. X-rays were taken which did not reveal a bone tumor. Accordingly, respondent recommended surgery. On February 4, 1972, respondent saw appellant at the Clovis Memorial Hospital. His records of that visit reflect that the callous appeared to be subsiding and he elected not to perform surgery at that time. Instead, he gave appellant an injection of cortisone. On October 17, 1972, appellant was again examined by respondent. His records indicate that her right heel had a callous which was still bruised.

Because of continued difficulties with her heel, appellant consulted Dr. R. V. Hickman on February 9, 1974. Dr. Hickman felt appellant had a painful bursa over her heel.[1] In this particular instance Dr. Hickman felt that the sac lay between the skin and the tendon, thus allowing for free movement of the skin. Dr. Hickman was of the opinion that the shoes appellant was wearing tended to irritate this area. Dr. Hickman again saw appellant on February 23, 1974, at which time he observed that the inflammation had subsided considerably. Finally, on March 23, 1974, appellant again saw Dr. Hickman. He felt at this time that the heel was normal again.

[*]Assigned by the Chairperson of the Judicial Council.
[1]Dr. Hickman defined a bursa as a small sac beneath the skin containing fluid.

Later appellant noticed her heel had begun to discolor just as it had before. In addition, the heel had started to drain from a small pinhole-sized opening. Because of this condition she again consulted respondent on June 18, 1974. He diagnosed the condition as a cyst and arranged for surgery within a few days.

On June 20, 1974, appellant went to the Clovis Memorial Hospital as directed by respondent. She reported to the emergency room where she was instructed by the nurse to lie on her stomach. She claims that during the procedure respondent told her that he had packed the wound with silver nitrate. She later told her mother and brother that respondent had packed the wound with silver nitrate at the hospital.

Respondent's records reflect that when he examined appellant on June 20, 1974, the wound was already open and that he simply drained the wound and packed it with Vasoline gauze, not silver nitrate, in order to allow for drainage and to prevent infection. The attending nurse's testimony supported respondent's recollection of the events of that day. At the time of surgery respondent felt that the wound was inflamed, but not infected, since the drainage did not appear pustular.

Following surgery, respondent advised appellant not to go back to work. He claims he had difficulty in convincing her. Contrary to this testimony, however, appellant claims that she asked respondent if it would be all right for her to return to work and he replied, "Sure, it was fine."

After the effects of the local anesthetic wore off, appellant testified that she experienced extreme pain. Accordingly, the next day she returned to respondent's office with her mother and asked that the packing be removed. According to appellant, respondent told her that he could not remove the packing because the silver nitrate had not yet had a chance to work.

The following Monday, June 24, 1974, appellant returned to respondent's office along with her boyfriend. Respondent looked at her heel and then instructed his nurse to remove the bandage. Both appellant and her boyfriend testified that the gauze bandage contained black spots intermittently. At trial Dr. Hickman testified that these black marks indicated to him that a silver nitrate packing had been used.

Appellant was next seen by respondent on June 27, 1974. At that time the wound was healing nicely. He told her to make an appointment for

two weeks hence and to continue to change the bandage twice daily. Appellant testified that after the June 27, 1974, appointment she continued to change the bandage twice daily. During this period she noticed the heel was getting progressively worse. There was increasing pain and the wound looked "angrier and angrier." She did not attempt to call respondent because she assumed that everything that was happening was a "natural cause, natural procedure."

On July 10, 1974, appellant kept her scheduled appointment with respondent. At that time he felt that the wound was infected. Accordingly, he cleaned and sutured the wound. He testified that he elected to attempt to "proximate" the wound at that time in order to help the healing. He felt that surgery could still be performed later and he would lose nothing by attempting to close the wound.

On July 13, 1974, appellant was seen by respondent for the last time. He referred her to Dr. John Geis, a plastic and reconstructive surgeon, because he felt that her condition warranted it.

Thereafter, appellant underwent six reconstructive surgical procedures together with attendant physical therapy. During these operations skin grafts were taken from various parts of her body which resulted in scarring in both the areas from which the skin was taken and on her heel.

At trial there was a substantial conflict in the expert testimony as to whether respondent's conduct fell below the community standard of medical care. Appellant called Dr. Hickman on her behalf. He testified that in his opinion the heel was infected on June 14, 1974. Because of that infection, Dr. Hickman felt that "the appropriate treatment" would have been to culture the drainage and to treat appellant with antibiotics. Under cross-examination Dr. Hickman admitted that drainage from a wound does not necessarily indicate infection and that a bursa will heal itself absent an infection. He also stated that appellant "probably would have had to have surgery regardless of which date she had been referred."

Also testifying on the subject of respondent's conduct in comparison to the community standard of medical care were Dr. William Argo and Dr. John Geis. Dr. Argo testified that from his review of the medical records and his understanding of the situation there was no evidence that the wound was infected on June 27, 1974, and that it was not below the

standard of care to omit having the drainage cultured. Dr. Argo further testified that assuming appellant's heel was infected on June 20, 1974, it was nevertheless within the standard of care to pack the wound with Vaseline gauze in order to promote drainage. Further, Dr. Argo stated that, regardless of whether appellant's problem was diagnosed as a bursa or a cyst, the procedure employed by respondent was well within the standard of medical practice.

Similarly, Dr. Geis testified that based upon his knowledge of the case and his review of the records, appellant's wound was not infected on June 27, 1974, and that respondent's conduct was not below the standard of care in not having the drainage cultured. He also testified that respondent's conduct did not fall below the standard of care by not referring appellant to a specialist or to another doctor as of June 27, 1974.

Both Dr. Argo and Dr. Hickman admitted that they would have expected appellant to call them if her heel had started to get worse.

I.

We first consider the issue of appellant's claim that it was error to instruct the jury in essence as provided in BAJI No 6.28.[2] We observe that contributory negligence was not pleaded and that both parties agree that there was no issue or evidence of contributory negligence in the case.

Appellant urges that the trial court was in effect instructing the jury on the doctrine of contributory negligence. Respondent argues that the action of the trial court was proper because this modified instruction was a correct interpretation of the law on proximate cause. But regardless, respondent reasons that any error was harmless and that the judgment should be affirmed. This issue, therefore, turns on whether the facts warranted the giving of this instruction and, if they did, whether the instruction was a correct expression of the law.

A judgment will not be reversed for errors in jury instructions unless it appears reasonably probable that, absent the error, the jury would have rendered a verdict more favorable to the appellant. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

---

[2]The court's instruction is quoted in the body below.

■ The case of *Jarchow* v. *Transamerica Title Ins. Co.* (1975) 48 Cal.App.3d 917, 947 [122 Cal.Rptr. 470], succinctly lays out the standard in reviewing jury instructions: "While a party is entitled to have the jury instructed on his theory of the case [citation], the trial judge need not use the instructions submitted by that party, but may phrase his own. [Citation.] When reviewing the instructions given at trial the appellate court must consider all the instructions as a whole, not severally, to determine whether error was committed. [Citation]." It is Hornbook law that each party to a lawsuit is entitled to have the jury instructed on all his or her theories of the case that are supported by the pleadings and the evidence. (*Phillips* v. *G. L. Truman Excavation Co.* (1961) 55 Cal.2d 801, 806 [13 Cal.Rptr. 401, 362 P.2d 33].) The trial court must instruct the jury on all vital issues involved. (*Ibid.*)

In this case, at respondent's request, the trial court instructed the jury as follows: "It is the duty of a patient to follow all reasonable and proper advice and instructions given him by his doctor regarding the patient's care, activities and treatment. A doctor is not liable for any injury proximately resulting solely from the negligent failure of the patient to do so. Such failure, however, does not relieve a doctor of responsibility for any injury *proximately* resulting ~~solely~~ from any malpractice on his part." (The italics indicates the portion added by the trial court and the deletion indicates the portion omitted.) The court intimated its reasons for giving the instruction at the hearing for a new trial. "THE COURT: But, the instruction has to do with proximate causation, as I understand it. If the injury, any injury results to a patient because the patient fails to follow advice given to the patient by the doctor, then there's no causation, proximate causation to support an award."

First, it must be resolved whether the facts of this case support the trial court giving this modified instruction. If the instruction was given to bring before the jury the question of the plaintiff's contributory negligence, then the trial court erred. ■ It is error for a trial court to charge the jury with regard to contributory negligence when there is no expert testimony the plaintiff was negligent. (*LeMons* v. *Regents of University of California* (1978) 21 Cal.3d 869, 874 [148 Cal.Rptr. 355, 582 P.2d 946]; *Barton* v. *Owen* (1977) 71 Cal.App.3d 484, 504 [139 Cal.Rptr. 494].)

■ Even though the case at bench is devoid of any evidence that appellant was in any way negligent, counsel for the respondent in his closing argument may have presented the jury with this impermissible basis for finding against appellant: "[Respondent's attorney:] Now, you

have been read an instruction, and I want to read it to you again. [Thereupon respondent's attorney reread the modified version of BAJI No. 6.28.] [¶] Now, he [respondent]—there is no testimony in this case that Dr. Woo said, 'Come back if you have a problem.' However, he has ongoing care, he has her scheduled to come back on the 10th. She is very intelligent, she understands what's going on and quite frankly it's hard for me to understand why she didn't do something about it and I think the fact she didn't do something about it is one of the major if not the major cause, for what ultimately happened here." A reading of the entire record indicates contributory negligence was not further mentioned or argued. The parties both focused their presentation on whether respondent was negligent.

Second, with the acknowledged lack of any evidence of contributory negligence, can this modified instruction be construed as correctly instructing the jury only on the legal notion of "proximate cause?" We think not.

A doctor's malpractice must cause the patient's injury. In other words, "the breach of duty—the negligent act or omission—must be the . . . cause . . . of plaintiff's injury." (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 620, p. 2901.)[3] The "test" for causation has been framed by some commentators as follows:

"If the defendant's conduct was a substantial factor in causing the plaintiff's injury, it follows that he will not be absolved from liability merely because other causes have contributed to the result, since such causes, innumerable, are always present.

". . . . . . . . . . . . . . . . . . . .

"Whether [the defendant's conduct] was such a substantial factor is for the jury to determine, unless the issue is so clear that reasonable men could not differ. It has been considered that 'substantial factor' is a phrase sufficiently intelligible to the layman to furnish an adequate guide in instructions to the jury, and that it is neither possible nor desirable to reduce it to any lower terms." (Prosser, Law of Torts (4th ed. 1971) § 41, p. 240.)

The jury was instructed on the question of proximate cause in the language of BAJI No. 1.11: "The words 'subject to liability,' as used in

---

[3]"Proximate" or "legal" cause must be differentiated from "causation" or "cause and effect." (See Prosser, Law of Torts (4th ed. 1971) § 42, p. 244.) Proximate cause refers to the question of whether a defendant should be legally responsible for the plaintiff's injury. (*Ibid.*)

these instructions mean that a defendant is liable for another's injury proximately caused by such defendant's conduct." Proximate cause was defined for the jury pursuant to BAJI No. 3.75 as follows: "A proximate cause of an injury is a cause which, in natural and continuous sequence, produces the injury, and without which the injury would not have occurred."

Thus, it is clear that the jury was completely and adequately advised on the issue of proximate cause. We, therefore, cannot agree that the complained-of instruction went solely to the issue of proximate cause. The instruction erroneously injected into the case the issue of plaintiff's contributory negligence when obviously there was no evidence of any such negligence.

Having found that it was error to give modified BAJI No. 6.28, we must now address the issue of whether that error was prejudicial (see Cal. Const., art. VI, § 13), thereby requiring a reversal.

■ The case of *LeMons* v. *Regents of University of California, supra,* 21 Cal.3d 869 at page 876 is especially helpful: "While there is no precise formula for measuring the effect of an erroneous instruction [citation], a number of factors are considered in measuring prejudice: (1) the degree of conflict in the evidence on critical issues [citations]; (2) whether respondent's argument to the jury may have contributed to the instruction's misleading effect [citation]; (3) whether the jury requested a rereading of the erroneous instruction [citation] or of related evidence [citation]; (4) the closeness of the jury's verdict [citation]; and (5) the effect of other instructions in remedying the error [citations]."

■ The record indicates that there was substantial credible evidence presented by each side on the issue of respondent's negligence or lack thereof. We cannot divine from the general verdict whether the jury found that respondent was not negligent or whether they were confused by the giving of the contributory negligence instruction and therefore found that appellant was also negligent.

Further, the closing argument of counsel for the respondent compounded the error by suggesting to the jury that the major cause of appellant's injury was her failure to return to respondent before her scheduled appointment. From this the jury very well may have determined that appellant was negligent in that regard, especially since the argument was made in conjunction with counsel rereading the modified version of BAJI No. 6.28.

In addition, we note that the jury voted nine to three in favor of respondent. The *LeMons* court pointed out the importance of this fact thusly: "Even if only one of the nine jurors who supported the verdict voted on this basis, the effect was prejudicial. Here, as in *Robinson v. Cable, supra,* 55 Cal.2d at p. 428, '[t]he fact that only the bare number of jurors required to reach a verdict agreed upon the verdict for defendants lends further support to the probability that the erroneous instruction was the factor which tipped the scales in defendants' favor.' [Citation.]" (*LeMons* v. *Regents of University of California, supra,* 21 Cal.3d 869 at p. 877.)

Lastly, we have perused the other instructions given to the jury and can find none which remedy the error of the giving of modified BAJI No. 6.28.

It therefore appears that four of the five *LeMons* criteria apply to the instant case. We hold that the jury may have been misled and that a remand is necessary to assure appellant of a fair trial.

Because this matter must be remanded for further proceedings, we deem it appropriate, in the interest of judicial economy, to discuss the remaining issues raised by appellant.

## II.

As indicated earlier herein, appellant claims she was prejudiced by the trial court's failure to instruct the jury on the legal doctrine of res ipsa loquitur.[4] In general that doctrine is only applicable in the following situation: "[W]here the accident is of such a nature that it can be said, in the light of past experience, that it probably was the result of negligence by someone and that the defendant is probably the person who is responsible. In determining whether such probabilities exist with regard to a particular occurrence, the courts have relied both upon common knowledge and the testimony of expert witnesses, and they have considered the circumstances relating to the accident in each particular case, such as the extent of control exercised by the defendant, the plaintiff's own conduct, the likelihood of negligence by some third person, and in some situations, evidence that the defendant is better able

[4]Prosser provides an insightful background on this doctrine. (Prosser, Law of Torts (1971) Circumstantial Evidence, § 39 et seq., pp. 211-235.) In California the legislative pronouncement in this regard is found in the Evidence Code at section 646 (see also Witkin, Cal. Evidence (1977 supp.) Burden of Proof and Presumption, § 260A, p. 55).

than the plaintiff to explain what happened." (*Zentz* v. *Coca Cola Bottling Co.* (1952) 39 Cal.2d 436, 446 [247 P.2d 344]; see also *Contreras* v. *St. Luke's Hospital* (1978) 78 Cal.App.3d 919, 930 [144 Cal.Rptr. 647].) In determining whether a res ipsa loquitur instruction should be given, the facts must be viewed in a light most favorable to the requesting party. A party must present some substantial evidence which, if believed by the jury, would entitle it to draw an inference of negligence from the happening of the accident itself. (*Kerr* v. *Bock* (1971) 5 Cal.3d 321, 324 [95 Cal.Rptr. 738, 486 P.2d 684]; *Folk* v. *Kilk* (1975) 53 Cal.App.3d 176, 184 [126 Cal.Rptr. 172].)

■ In medical malpractice litigation, this doctrine has been slightly modified by the courts. A plaintiff must present expert testimony that the complained-of injury would not have occurred but for the negligence of a doctor. (*Barton* v. *Owen, supra,* 71 Cal.App.3d 484, 493.) The average judge or juror does not have the common knowledge to decide whether the doctor was negligent. (*Ibid.*) "Therefore, it is usually a question of fact, for the triers of fact, as to whether the doctor was negligent based upon the expert testimony that was received into court." (*Ibid.;* see also *Contreras* v. *St. Luke's Hospital, supra,* 78 Cal.App.3d 919.) An exception to this general rule arises when the alleged negligence of the doctor can be determined by a lay person relying on his common knowledge. For example, as stated in Prosser on Torts (4th ed. 1971) section 32, pages 164-165, "Where the surgeon saws off the wrong leg, or there is injury to a part of the body not within the operative field, it has been held that the jury may infer negligence without the aid of any expert." ■ In this case, the treatment of an infected foot is not within the common knowledge of most lay persons. Both sides presented expert testimony to resolve whether respondent was negligent. This fact alone indicates that appellant's heel inflammation or infection was quite complex.

We hold that the trial court was correct in not instructing the jury on res ipsa loquitur because (1) there was no expert testimony to support giving this instruction and (2) this is not the type of injury from which the jury may infer negligence based on their common knowledge.

### III.

The trial court ruled that Civil Code section 3333.1[5] applied to trials in which the cause of action accrued prior to the effective date of the law.

[5]This section abrogates the collateral source rule in actions against health care providers. The collateral source rule is a judicial doctrine which provides that where an

The jury was, therefore, instructed pursuant to the provisions of said section.[6]

Civil Code section 3333.1 provides: "(a) In the event the defendant so elects, in an action for personal injury against a health care provider based upon professional negligence, he may introduce evidence of any amount payable as a benefit to the plaintiff as a result of the personal injury pursuant to the United States Social Security Act, any state or federal income disability or worker's compensation act, any health, sickness or income-disability insurance, accident insurance that provides health benefits or income-disability coverage, and any contract or agreement of any group, organization, partnership, or corporation to provide, pay for, or reimburse the cost of medical, hospital, dental, or other health care services. Where the defendant elects to introduce such evidence, the plaintiff may introduce evidence of any amount which the plaintiff has paid or contributed to secure his right to any insurance benefits concerning which the defendant has introduced evidence. . . ."

In this case the alleged negligence took place in June of 1974. The complaint was filed on May 8, 1975. The "collateral source rule" was changed on December 12, 1975, and the trial took place in February of 1977.

The question of whether Civil Code section 3333.1 applies to trials in which the cause of action accrued prior to the effective date of the law is one of first impression.

Statutes should not be given retroactive application unless it is clearly apparent that the Legislature so intended. (*Aetna Cas. & Surety*

---

injured party receives some compensation for his or her injuries from a source wholly independent of the tortfeasor, such payment is not deducted from the damages which the plaintiff would otherwise collect from the tortfeasor. (*Peri* v. *L.A. Junction Ry.* (1943) 22 Cal.2d 111, 131 [137 P.2d 441]; Annot., Collateral Source Rule—Aid or Gratuity (1977) 77 A.L.R.3d 366 and cases cited therein.) For a critical opinion of the collateral source rule see Flemming, *Collateral Source Rule and Loss Allocation in Tort Law* (1966) 54 Cal. L.Rev. 1478.

[6]Immediately after reading BAJI No. 14.00, the trial court instructed the jury as follows: "The reasonable value of medical, hospital and nursing care, services and supplies reasonably required and actually given in the treatment of the plaintiff. In determining the amount, if any, to be included in your award for such items, you shall take into consideration the extent to which payment has already been made by insurance benefits. [¶] The reasonable value of medical, hospital and nursing care, services and supplies reasonably certain to be required and given in the future."

*Co.* v. *Ind. Acc. Com.* (1947) 30 Cal.2d 388 [182 P.2d 159]; see also 45 Cal.Jur.2d (1958) Statutes, § 114, p. 624.) It is generally held that the Legislature should set out its intent to have the statute operate retroactively in clear language. (*DiGenova* v. *State Board of Education* (1962) 57 Cal.2d 167 [18 Cal.Rptr. 369, 367 P.2d 865].) Furthermore, the Legislature is presumed to be aware of existing law when it enacts a statute. (*In re Cox* (1970) 3 Cal.3d 205 [90 Cal.Rptr. 24, 474 P.2d 992].)

 In the instant case the Legislature was given an opinion by the Legislative Counsel prior to its passage of the statute which became section 3333.1. That opinion reads in pertinent part as follows: "Subdivision (a) of section 3333.1 would provide for the introduction into evidence of benefits received from collateral sources, and thus may serve to reduce damages recovered or received by the plaintiff. It was held in *Campbell* v. *New York Evening Post* (1927) New York (157 N.E. 153) that a statute authorizing, for libel suits, the introduction into evidence of damages recovered or received by the plaintiff from other sources, thereby reducing the damages, could not be applied retroactively. The court based its holding on the rule that a statute diminishing the liability of the defendant is not to be applied retroactively. [¶] Thus, that case indicates that the provisions under consideration, by reducing the amount of damages to which the plaintiff would be entitled in the action would fall within the proscription against retroactive application of statutes reducing damages in an action based upon a prior injury. [¶] . . . We are of the view that *Campbell* would be followed in this state. . . ." (Ops.Cal.Legis. Counsel No. 19849 (Sept. 12, 1975, 1975-1976 Second Ex. Sess.) § 13, p. 374.)

We must presume that the Legislature was aware of the Legislative Counsel's opinion, that it understood that opinion, and that it nonetheless enacted session 3333.1 without any mention of its retroactivity.

Respondent urges that there is convincing evidence that the Legislature in fact intended the statute to operate retroactively. He points to the fact that Civil Code section 3333.1 was enacted as an urgency statute. He further argues that the language of the preamble to the act clearly indicates that the remedy take effect immediately: "The Legislature finds and declares that there is a major health care crisis in the State of California attributable to skyrocketing malpractice premium costs and resulting in a potential breakdown of the health delivery system, severe hardships for the medically indigent, a denial of access for the economi-

cally marginal, and depletion of physicians such as to substantially worsen the quality of health care available to citizens of this state. The Legislature, acting within the scope of its police powers, finds the statutory remedy herein provided is intended to provide an adequate and reasonable remedy within the limits of what the foregoing public health and safety considerations permit now and into the foreseeable future." (Stats. 1975-1976, Second Ex. Sess., ch. 2, § 12.5.)

We are not persuaded that the preamble is indicative of any such legislative intent. Armed as it was with its counsel's opinion on retroactivity, the Legislature could very easily have inserted such language in the statute itself. It chose not to do so.

Because there is no explicit language in the statute making it retroactive and because there is every indication that the Legislature intended otherwise, we hold that Civil Code section 3333.1 should be applied prospectively only.[7]

The judgment is reversed.

Franson, Acting P. J., and Zenovich, J., concurred.

---

[7]We do not reach the interesting point of the constitutionality of Civil Code section 3333.1. While that issue was raised in the trial court, it was not argued on appeal.