[Civ. No. 35050. First Dist., Div. Three. Nov. 24, 1975.]

JOHN R. FOLK, Plaintiff and Appellant, v.
MAERT KILK et al., Defendants and Respondents.

## COUNSEL

William Kiriakis, Leland P. Jarnagin and Robert A. Seligson for Plaintiff and Appellant.

Crosby, Heafey, Roach & May, Herbert I. Pierce III, McNamara, Lewis & Craddick, Richard E. Dodge, Russell Bruno, Hassard, Bonnington, Rogers & Huber, Robert D. Huber and Richard G. Logan, for Defendants and Respondents.

## OPINION

**GOOD, J.\***—Appellant sued St. Luke's Hospital, Dr. Campbell, an internist, and Dr. Kilk, an ear, nose and throat specialist, to recover damages for injuries resulting from a brain abscess that became manifest five days after Dr. Kilk had performed a tonsillectomy upon him. A

---

\*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

judgment of nonsuit was entered in favor of the hospital. The jury returned a defense verdict in favor of the doctors. The trial court had refused res ipsa loquitur instructions requested by appellant.

The surgery was about 8 a.m., on May 21, 1970. Dr. Kilk prescribed the post operative administration of an antibiotic capsule four times daily for five days. The claim against the hospital rests upon a notation on the nurse's clinical record indicating that at 5 p.m. that afternoon the patient was unable to swallow his capsule. The nurse did not notify Dr. Kilk of this fact. The next entry indicates that at 7 p.m. the patient took some jello and juice. There was uncontradicted evidence that inability to swallow medication after a tonsillectomy is very common. The doctor testified he would usually expect the nurse to notify him of the event, especially if several unsuccessful attempts were made to administer the medication. There was no evidence as to the standard of care applicable to a nurse from which it could be inferred that the nurse had a duty to immediately notify the doctor of the temporary delay or to treat the common place occurrence as an emergency. Nor was there evidence as to the medical consequence of a single delay, unspecified as to time in minutes or hours, in the administration of one of a series of the prescribed antibiotic. The clinical record does not show when the course of medication began nor at what hours the capsules were administered either before or after 5 p.m.

██ Upon appeal from a nonsuit, the evidence must be viewed in the light most favorable to a plaintiff. (*Seneris* v. *Haas* (1955) 45 Cal.2d 811, 821 [291 P.2d 915, 53 A.L.R.2d 124]; *Huffman* v. *Lindquist* (1951) 37 Cal.2d 465, 468-469 [234 P.2d 34, 29 A.L.R.2d 485].) ██ Even in this light, it does not appear that the nurse's failure to inform the doctor of the patient's inability to swallow at 5 p.m. (other than by entry in the clinical record) was a departure from any standard of care or that the transient delay was a proximate cause of injury. Further, the facts are not sufficient to require a res ipsa instruction, conditional or otherwise. We are accordingly required to affirm the judgment of nonsuit in favor of the hospital.

The claim against the doctors rests upon their failure to take a throat culture in time to have the results available before the surgery. The claim arises out of the presence of haemophillus influenza (HI *post*) shown by a culture that had been ordered on May 20, the night before surgery, and reported on May 23 and the purport of the telephone consultation on April 13 between Dr. Kilk and Dr. Campbell, who had referred

appellant to Dr. Kilk on April 8. The doctors contradicted each other and Dr. Kilk's deposition contradicted his trial testimony forcing him into an explanation that his deposition testimony had been mistaken and he did not realize his mistake until he had heard Dr. Campbell testify. According to the deposition, the doctors agreed that appellant's tonsils should be removed and May 21 was tentatively set as the date of surgery; the two specialists discussed the patient's history and general condition and agreed that "good practice" would require that the results of another blood count, throat culture and heterophile should be had before surgery; that Dr. Campbell would furnish these results to Dr. Kilk before the surgery; and, it would be "bad practice" to proceed without such results. It usually takes two or three days to develop a throat culture so that bacteria can be identified.

Dr. Campbell first saw the patient on March 27 and noted grossly enlarged tonsils and signs of mononucleosis. He had ordered a complete blood count, throat culture and heterophile. The throat culture showed the presence of beta strep; the heterophile, a light case of mononucleosis; and, the blood count was within normal range. Antibiotics were prescribed and the patient returned to Dr. Campbell on April 8. There was no acute inflammation and the throat had improved. Dr. Campbell saw no reason for another throat culture but ordered another blood count and heterophile and referred appellant to Dr. Kilk. The test results had not reached Dr. Campbell's desk at the time Dr. Kilk telephoned on April 13. They showed a normal blood count and were negative as to mononucleosis. The results of these tests were reported to Dr. Kilk a week or so before surgery.

When the patient reported to the hospital on May 20 for surgery the next morning, Dr. Kilk found no sign of acute infection and no sign of mononucleosis. He ordered a blood count which is standard procedure and a throat culture which he does not ordinarily do, but did so, "on a hunch" so that he could be clued as to the most appropriate antibiotic if post operative infection developed. The surgery was uneventful and appellant made good progress in recovery except for his inability to swallow the 5 p.m. capsule and a spiking of temperature around 2 p.m. A spiking is a brief but pronounced elevation of temperature and is considered a normal response to tissue trauma but it may be caused by infectious organisms entering the blood stream. Such organisms can enter the blood stream and attack various parts of the body until the blood coagulates at an incision, which takes a "good hour" or hour and a half.

Appellant was released from the hospital on May 22. On May 26 he called Dr. Kilk and complained of partial paralysis. Dr. Kilk instructed him to return to his internist. Dr. Campbell's examination led him to suspect a brain abscess and he was concerned about the possibility that disease organisms might have gotten from the throat to the brain. Dr. Campbell called Dr. Keller, a neurosurgeon, who hospitalized appellant and performed a craniotomy on June 6. The abscess was found and pus and damaged brain tissue were removed. The abscess was sterile because of the antibiotics that had been prescribed and no bacteria could be identified as its cause.

None of the five specialists who testified had ever heard of a brain abscess occuring immediately after a tonsillectomy. Aside from Dr. Kilk's deposition as to the necessity of a throat culture because of the exigencies of the particular case, there was no contradiction of the unanimous medical testimony that throat cultures are not standard preoperative procedures in tonsillectomies, and that, in the absence of acute inflammation doctors proceed to operate even if they know HI is present in a patient's throat because it is impossible to clear a throat of bacteria.[1] Also HI is extremely prevalent and found in 10 to 20 percent of healthy persons and is not considered as ordinarily pathogenic, i.e., disease producing. When it becomes pathogenic it attacks children more frequently then adults. Among children, it can cause meningitis (an inflammation of the lining of the brain), middle ear infections and croup. Among adults it can induce bronchitis where there is chronic respiratory infection, conjunctivitis (pink eye) and in rare cases, pneumonia. It is not listed among bacteria known to produce a brain abscess but, in the opinion of Dr. Valentine, a specialist in infectious disease, is the kind of pathogen that could produce one. Dr. Valentine testified that brain abscesses are ordinarily of slow development and require weeks or months to develop, but he would not rule out the possibility of rapid development.

*The res ipsa loquitur issue.*

When the 1970 Legislature enacted Evidence Code section 646, it recognized the judicial origin of the doctrine of res ipsa loquitur but did not attempt to change or codify the judicial formulation of the conditions

---

[1] Common knowledge affords an assumption that the mouth and throat are subject to constant bacterial invasion. There is thus an inference that a culture negative for HI taken two or three days before a tonsillectomy would afford no indication that HI or any other bacteria would not be present at the time of the operation.

wherein it becomes applicable. (Cf. Law Revision Com. comment (1970) Evid. Code (1975 Supp.) § 646.) It made the instruction mandatory upon request whenever the evidence or facts otherwise established would support the presumption. This is in conformity with the holding of *Seneris* v. *Haas, supra,* 45 Cal.2d 811, 827, that even if a trial judge would not find the fundamental elements from the evidence he must give the conditional instruction if the jury could reasonably find them to exist.

■ A rarely invoked exception to this rule is noted in Prosser's Law of Torts (4th ed. 1971) at pages 233-235, i.e., the instruction need not be given if a defendant establishes that he was free from negligence by evidence that cannot be rationally disbelieved. This exception is somewhat akin to that noted in *DiMare* v. *Cresci* (1962) 58 Cal.2d 292, at page 299 [23 Cal.Rptr. 772, 373 P.2d 860], wherein it was held that a plaintiff is not deprived of the benefit of the doctrine because he has introduced evidence of specific acts of a defendant's negligence unless *(exceptionally),* "the facts as to the cause of the accident and the care exercised by the defendant are shown as a matter of law thus eliminating any justification for resort to the inference of negligence." *Bedford* v. *Re* (1973) 9 Cal.3d 593, 599-600 [108 Cal.Rptr. 364, 510 P.2d 724], contrasts *DiMare's* facts with those in *Akins* v. *County of Sonoma* (1967) 67 Cal.2d 185 [60 Cal.Rptr. 499, 430 P.2d 57], where all of the facts were known and there was no dispute as to causation and the exception was therefore applicable.

■ The landmark medical malpractice case of *Ybarra* v. *Spangard* (1944) 25 Cal.2d 486, at page 489 [154 P.2d 687, 162 A.L.R. 1258], restated the fundamental elements of res ipsa in terms of a three part test: " '(1) the accident must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff.' " A simplified two-part rule was formulated in *Zentz* v. *Coca Cola Bottling Co.* (1952) 39 Cal.2d 436 [247 P.2d 344], (holding the doctrine applicable) "where the accident is of such a nature that it can be said, in the light of past experience, that it probably was the result of negligence by someone and that the defendant is probably the person who is responsible." *(Id.* at p. 446.)

In malpractice cases arising out of surgical procedures, satisfaction of the second and third elements of the *Ybarra* rule are usually inherent in the situation because the patient is under the exclusive control of the

doctors or hospital and in no condition to perform a voluntary action that might contribute to his injury. Attention is thus focused on the first element stated in *Ybarra* and the first clause of the *Zentz* general rule. Courts have not discarded the *Ybarra* rule in favor of that of *Zentz*. In *Bardessono* v. *Michels* (1970) 3 Cal.3d 780, at page 788 [91 Cal.Rptr. 760, 478 P.2d 480, 45 A.L.R.3d 717], the Supreme Court combined *Ybarra's* first element with *Zentz'* last clause as drawn from *Tomei* v. *Henning* (1967) 67 Cal.2d 319 [62 Cal.Rptr. 9, 431 P.2d 633]. In the very recent case of *Newing* v. *Cheatham* (1975) 15 Cal.3d 351 [124 Cal.Rptr. 193, 540 P.2d 33], both rules are set out in a single paragraph. We conclude that *Zentz* was not intended to replace *Ybarra* but was promulgated to emphasize the factor of a greater probability of negligence as the fundamental basis of the doctrine.

██ Where a medical process or procedure is not a matter of common knowledge, expert testimony is necessary to determine whether a probability of negligence appears from the happening of an accident or untoward result. (*Tomei* v. *Henning, supra,* 67 Cal.2d 319, 322.) The question was discussed in *Bardessono* v. *Michels, supra,* 3 Cal.3d 780, and footnotes on pages 789 and 790 list instances where common knowledge was deemed acceptable and where expert testimony was required. ██ The law requires only that doctors exercise that reasonable degree of skill, knowledge and care ordinarily possessed and exercised by doctors under similar circumstances in diagnosis and treatment, with no different or higher degree of responsibility than that obtaining in their professional community. The law does not hold doctors liable for every untoward result which may occur. (*Carmichael* v. *Reitz* (1971) 17 Cal.App.3d 958, 975-976 [95 Cal.Rptr. 381].) ██ The standard of skill, knowledge and care prevailing in a medical community is ordinarily a matter within the knowledge of experts. (*Sinz* v. *Owens* (1949) 33 Cal.2d 749, 753 [205 P.2d 3, 8 A.L.R.2d 757]; *Keen* v. *Prisinzano* (1972) 23 Cal.App.3d 275, 279 [100 Cal.Rptr. 82].)

██ In our opinion, the etiology of brain abscesses and the standards of care prevailing in the medical community as concern tonsillectomies are not matters of common knowledge and therefore we are bound by the expert testimony. It is not a matter of common knowledge that when a brain abscess begins to develop shortly after a tonsillectomy, the abscess probably was caused by negligence. Even among experts little is known about the causation of brain abscesses. Their nature is such that they are difficult to study. Since most brain abscesses originate in areas other than the throat (sinus passages, middle ear and lungs being the

most common sources), and over a longer time, it is not even common knowledge that the abscess was probably caused by the tonsillectomy, let alone that the abscess was probably caused by a negligently performed tonsillectomy.

The essence of medical malpractice is a violation of the prevailing standard of care. It is usually a failure to possess the knowledge that doctors commonly possess or to apply and use that knowledge in the diagnosis and care of a patient. Where the latter is involved, the act or failure to act constituting the alleged violation of the applicable standard must be a proximate cause of the injury. In this case, it is clear from the record that the performance of the tonsillectomy without determining whether prevailing HI or other bacteria were present in the appellant's throat was not a violation of the prevailing standard of care.

The question then arises was the failure to take a throat culture in sufficient time to secure its results before proceeding with the operation —a standard postulated in Dr. Kilk's deposition but contradicted at trial—a negligent act that in view of the rarity of a brain abscess after a tonsillectomy would give the appellant the benefit of the rule of *Clark* v. *Gibbons* (1967) 66 Cal.2d 399, at page 412 [58 Cal.Rptr. 125, 426 P.2d 525], that "proof that when due care is exercised an injury rarely occurs, accompanied by other evidence indicating negligence, may be sufficient to warrant an instruction on conditional res ipsa loquitur." (Cf. *Quintal* v. *Laurel Grove Hospital* (1964) 62 Cal.2d 154 [41 Cal.Rptr. 577, 397 P.2d 161].) In determining whether appellant was entitled to the benefit of the conditional res ipsa loquitur doctrine, the evidence must be viewed in the light most favorable to him. (*Kerr* v. *Bock* (1971) 5 Cal.3d 321, 323 [95 Cal.Rptr. 788, 486 P.2d 684].) *Kerr* relied on *Farber* v. *Olkon* (1953) 40 Cal.2d 503 [254 P.2d 520], which involved a directed verdict. *Farber* in turn, relied on two cases involving nonsuits. If the rule enjoined by *Kerr* is the same as that applicable in appeals from judgments of nonsuit or upon directed verdicts, we may not consider the credibility of witnesses and must give appellant's evidence all of its legal value, indulging every legitimate inference in its favor and disregarding all conflicting evidence. (4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 353, pp. 3152-3153; *Estate of Lances* (1932) 216 Cal. 397, 400 [14 P.2d 768].)

We are accordingly required to accept the standard postulated in Dr. Kilk's deposition and reject Dr. Campbell's testimony that on April 13 he was discussing only the blood count and heterophile that he had

ordered on April 8. But even when viewed in this light, we have reached the conclusion, below explained, that appellant's evidence of the specific act of negligence—failure of the doctors to secure the additional throat culture discussed between them on April 13—and the rarity of the untoward result did not warrant a conditional res ipsa instruction.

*Clemens* v. *Regents of University of California* (1970) 8 Cal.App.3d 1 [87 Cal.Rptr. 108], points out that it is not mandatory to give a res ipsa instruction whenever the evidence establishes rarity of occurrence plus specific acts and that *Clark* v. *Gibbons, supra,* 66 Cal.2d 399, holds only that the combination *may* be sufficient. It depends upon whether the combination, in the circumstances of the particular case, affords reasonable ground for believing that the accident was more probably caused by negligence than not. There is thus a question of whether or not the presence of HI in view of appellant's history of susceptibility to infections, was a "danger signal" that should have been ascertained and weighed before proceeding with surgery. (*Quintal* v. *Laurel Grove Hospital, supra,* 62 Cal.2d 154, 166.) But all of the medical testimony concerning standards of care applicable to tonsillectomies and professional knowledge of the pathogenic characteristics of HI is to the effect that HI is not regarded in the profession as a danger signal. Its prevalence is such that considering the vast number of tonsillectomies, many of them must have occured while HI was present. In this instance, the combination of rarity plus specific act could not lead to a reasonable conclusion that it is more probable than not that negligence caused the untoward result. The evidence that HI is the kind of pathogen that *could* cause a brain abscess and that a doctor would *not rule out* the possibility of a rapid (but unusual) development of the abscess amounts to no more than a possibility that HI was the causative factor. Further, because of the time required to develop a culture, the results of one taken two, three or more days before an operation would not afford any assurance that the patient had not been invaded by HI during the interim. We conclude that even if the deposition standard of care had been followed the operation would have proceeded because in the absence of acute inflammation the presence of HI is not considered an inhibiting factor under medical standards prevailing at the time and place of surgery. In view of this a probability of negligence as a proximate cause of the injury evaporates. Upon this record, to have allowed the jury to balance possibilities rather than probabilities would be the equivalent of allowing them to create their own standards for the medical profession and to project a knowledge of the characteristics of HI greater than that possessed by a specialist in infectious diseases.

*Rulings upon evidence.*

■ With reference to a brain abscess after a tonsillectomy Dr. Campbell was asked: "Is that something that ordinarily happens in the absence of negligence?" An objection that the question was "too broad and indefinite" was interposed and sustained. The question was not framed in the precise context of either the *Ybarra* or *Zentz* rules. It did not address itself to the essential factor of probability. We hold that any error in this and other like rulings to have been harmless because it is clear that the only answer Dr. Campbell could have given would be that the event, which he had never heard of, was so rare that in view of medical knowledge about HI the question could not be answered.

■ Similarly, Dr. Kilk was asked whether if Dr. Campbell had not said it was alright to proceed with surgery would there be reasons why he would not have proceeded. An objection based upon ambiguity was sustained. Although the question is general we fail to detect ambiguity in it. But again, in the context of all of the medical evidence any error was without prejudice because it is clear that had he been permitted he would have given a negative answer.

■ A more difficult question is presented by the order striking the opinion testimony of Dr. Keller. The neurosurgeon was asked if he had an opinion as to the cause of the abscess and answered affirmatively. Asked for that opinion he continued: "Well, the surgery procedure was conducted on the throat and a pathogen was identified from the throat. Subsequently the patient developed a brain abscess, and though this was sterile, there seems to be a relationship time wise between the surgery on the throat and the production of this brain abscess. Q. What was the pathogen that you had reference to? A. Haemophillus influenza identified at the tonsillectomy."

The court sustained an objection (leading) to a follow up question asking whether it was the doctor's opinion that the pathogen went into the brain and caused the abscess. The doctor was then asked if he had medical opinion as to causation and again gave an affirmative answer but was not allowed to restate or elaborate upon his opinion because a dual objection ("asked and answered" and "no foundation") was sustained. The "same objection" was made to the next question asking what was the most likely organism that caused the abscess. This was sustained with the court commenting that the question had been answered. On cross-examination Dr. Keller stated that he knew that HI could attack

the meninges (lining of the brain) but that he knew little else about HI. A subsequent motion to strike the opinion on the basis of lack of sufficient knowledge was granted.

The trial court was technically correct in sustaining the objection to leading the witness because Dr. Keller was not a defendant and had been called by appellant. However, we believe that appellant's counsel was unduly limited in his attempt to clarify the "time wise" relationship between pathogen, surgery and abscess or to otherwise clarify the opinion. We further believe that the court erred in striking the opinion.

Respondent's argument is that the lack of familiarity with HI which the doctor acknowledged on cross-examination deprived his opinion of the requisite foundational expertise. We do not agree. As a neurosurgeon he was entitled to express his opinion. In general, the medical testimony reflects scant knowledge concerning HI. The admission went to the weight of the opinion. Even Dr. Campbell, when asked for his opinion as to cause, said he could not answer and the question would have to be addressed to a neurosurgeon.

None of the doctors came close to implying that the injury was probably caused by negligence. Assuming that Dr. Keller would have said there was reasonable medical probability that the abscess was caused by HI that entered the blood stream through the surgical incision—this is by no means certain and his "time wise" relationship might have reduced itself to a mere possibility—the testimony would not have been sufficient in and of itself to allow a reasonable jury to find that the abscess was probably caused by negligence. There would have to have been additional evidence from which it could be inferred that doctors know or should have known that HI was more dangerous than they believed and was likely to produce brain abscesses and therefore that the prevailing standards were, in themselves, negligent. All of the extensive medical testimony is to the contrary and any error is accordingly nonprejudicial.

### Other issues.

We find no merit in appellant's remaining assignments of error. The fact that the judge, apparently through inadvertence, instructed the jury on the standard of care required of general practitioners rather than that of specialists is not of consequence. All of the medical witnesses were specialists. The only evidence before the jury pertained to standards

required of specialists. The jury could not have been misled. Further, the judge asked the counsel if any requested instruction had been omitted and counsel answered in the negative. The error was accordingly waived.

The use of BAJI No. 3.76 (Legal Cause) rather than BAJI No. 3.75 (Proximate Cause) was not error and did not misstate the law. Nor was the court's refusal of plaintiff's request to have a portion of Dr. Valentine's testimony read to the jury in addition to the precise portion thereof that the jury requested an abuse of discretion. (*People* v. *Gordon* (1963) 222 Cal.App.2d 687, 689 [35 Cal.Rptr. 335].) Also the refusal of questions re interest in insurance companies was entirely proper. (*Scally* v. *Pacific Gas & Electric Co.* (1972) 23 Cal.App.3d 806 [100 Cal.Rptr. 501].) It was not an abuse of the discretion conferred upon trial judges by rule 228 of the California Rules of Court.

The judgment is affirmed.

Brown (H. C.), Acting P. J., and Scott, J., concurred.

A petition for a rehearing was denied December 24, 1975, and appellant's petition for a hearing by the Supreme Court was denied January 21, 1976.