**Dorothy POLIKOFF, Plaintiff,**

v.

**UNITED STATES of America,
Defendant.**

Civ. A. No. 88–1125–WCP(P).

United States District Court,
S.D. California.

Oct. 11, 1991.

Julie Zatz, U.S. Attorney's Office, Los Angeles, Cal., for U.S.

Michael J. Moriarty, San Francisco, Cal., for plaintiff.

## I. FINDINGS OF FACT AND CONCLUSIONS OF LAW

COPPLE, District Judge.

### I. FINDINGS OF FACT

1. Plaintiff, Dorothy Polikoff, is the wife of William Polikoff, deceased.

2. Mr. Polikoff and Mrs. Polikoff, as veterans, were entitled to medical care from the Veterans Administration.

3. Mr. Polikoff had a history of coronary artery disease dating back to 1963.

4. Mr. Polikoff was an inpatient at the University of California at San Diego (UCSD) between January 9 and January 21, 1984.

5. Dr. William Moores was employed by UCSD as a staff surgeon on the surgical service and as an associate clinical professor of surgery.

6. Dr. Moores was also employed as the Chief of Cardiothoracic Surgery, a part of the surgical service, at the Veterans Administration Medical Center at San Diego (VAMC).

7. Prior to Mr. Polikoff's admission to the surgical service at the UCSD, Dr. Moores had never treated Mr. Polikoff or consulted on his case at either the VAMC or UCSD.

8. Dr. Moores performed cardiac bypass surgery on William Polikoff at the UCSD on January 13, 1984.

9. None of the actions undertaken by Dr. Moores at the UCSD with respect to Mr. Polikoff were within the scope of his employment as a physician with the VAMC; nor were those actions under the control of the VAMC.

10. None of the actions undertaken by any of the health care providers at the

UCSD, with respect to Mr. Polikoff, were within the scope of any employment with the VAMC; nor were those actions at the UCSD under the control of the VAMC.

11. Mr. Polikoff received a blood transfusion during the bypass surgery at the UCSD on January 13, 1984.

12. The blood transfused into Mr. Polikoff at the UCSD was obtained by UCSD from the San Diego Blood Bank (SDBB).

13. As a result of the transfusion at the UCSD, Mr. Polikoff contracted Hepatitis–B and the virus for the Acquired Immunodeficiency Syndrome (AIDS).

14. Mr. Polikoff was discharged from UCSD on January 21, 1984.

15. Following Mr. Polikoff's discharge from the UCSD in January of 1984, Dr. Moores never treated Mr. Polikoff or consulted with respect to Mr. Polikoff's care at the VAMC.

16. In 1985, Mr. Polikoff expressed concern to a VAMC physician about his perceived inability to sexually satisfy Mrs. Polikoff.

17. Mr. and Mrs. Polikoff attended marital therapy sessions between January and June of 1986.

18. One of the primary purposes of these marital therapy sessions was to improve the nature and extent of Mr. and Mrs. Polikoff's ongoing sexual activity.

19. During this time period, Mr. and Mrs. Polikoff were having sexual intercourse.

20. Mr. Polikoff considered his sexual relationship with Mrs. Polikoff to be a major change item.

21. Mr. and Mrs. Polikoff's sexual relationship included vaginal penetration.

22. The medical testimony at trial indicated, to a reasonable degree of medical certainty, that Mr. Polikoff transmitted the AIDS virus and Hepatitis–B to Mrs. Polikoff prior to June of 1986.

23. In June of 1986, Mrs. Polikoff was admitted to the VAMC for gall bladder surgery.

24. During that hospitalization, Mrs. Polikoff was diagnosed as having Hepatitis–B.

25. Mr. Polikoff was subsequently tested and diagnosed as a non-symptomatic carrier of Hepatitis–B in June of 1986.

26. At no time prior to June of 1986 did Mr. Polikoff show signs or symptoms of Hepatitis–B.

27. Dr. Douglas Richman testified that Mr. Polikoff did not show signs and symptoms prior to June of 1986, and that Mr. Polikoff's physical condition was more characteristic of heart disease and depression.

28. Mr. Polikoff never asked to be tested for the AIDS virus.

29. Mrs. Polikoff was readmitted to the VAMC on July 11, 1986, for treatment of Hepatitis–B and was discharged on July 30, 1986.

30. Mr. and Mrs. Polikoff were tested for the AIDS virus at a San Diego County facility in March of 1987.

31. Mr. Polikoff tested positive for the AIDS virus in April of 1987, and Mrs. Polikoff manifested evidence of the antibodies to the AIDS virus at the same time.

32. Mr. Polikoff was not a candidate for treatment with AZT.

33. Mr. Polikoff died in December of 1987.

34. At the time of trial, Mrs. Polikoff did not have symptoms of either full-blown AIDS or ARC (Aids Related Complex) and was taking AZT.

35. AIDS was not identified as a virus until April 23, 1984.

36. Prior to March of 1985, there was no test available to screen blood for antibodies to AIDS.

37. In March of 1985, the ELISA test was developed as a test for exposure to the AIDS virus.

38. The ELISA test was developed as a test for screening blood donors.

39. At present, there is still no known means by which to test for the presence of the AIDS virus itself.

40. Dr. William O'Connor, is a family practitioner in Vacaville, California. Dr. O'Connor's opinions with respect to the diagnosis and treatment of AIDS and ARC are not reasonably relied on by physicians involved in the diagnosis, care and treatment of AIDS and ARC.

41. Dr. O'Connor's opinions regarding the diagnosis, care and treatment of AIDS and ARC are based upon his desperate one-man crusade against the blood industry and, consequently, are biased and unreliable.

42. Although AIDS and Hepatitis–B are blood-borne diseases which can be transmitted by sexual contact, there was no credible scientific evidence confirming that the presence of one is a medically significant indication of the other disease.

43. In June of 1986, there was no known relationship between AIDS and Hepatitis–B.

44. There is no evidence that Hepatitis–B is a sign or symptom of AIDS in a transfusion recipient.

45. Dr. Marcus Conant testified that very few physicians in the country were testing patients in June of 1986, who were positive for Hepatitis–B, for the presence of the AIDS virus.

46. Dr. O'Connor and Dr. Kenneth J. Fawcett (by way of deposition testimony) testified that they knew of no physicians who were testing patients in June of 1986, who were positive for Hepatitis–B, for the presence of the AIDS virus.

47. Dr. Conant testified that of the approximately one million individuals infected with the AIDS virus, as of 1987, only 1.2 percent contracted the AIDS virus as the result of a blood transfusion.

48. In June of 1986, a patient who had received a blood transfusion test was not considered to be at high risk for the AIDS virus.

49. In June of 1986, a patient who had received a blood transfusion test was not considered to be at high risk for Hepatitis–B.

50. Hepatitis–B and the AIDS virus can be transmitted in the same sexual contact.

51. A patient who is positive for Hepatitis–B is not considered to be at high risk for the AIDS virus.

52. Approximately 1 percent of those patients positive for Hepatitis–B contracted it through a transfusion.

53. Approximately one-half of 1 percent of transfusion recipients contracted Hepatitis–B.

54. Mr. Polikoff was not a member of any group considered to be a high risk for the AIDS virus (i.e. homosexual, I.V. drug abuser or hemophiliac).

55. In June of 1986, it was not the practice for physicians to test patients for AIDS who were positive for Hepatitis–B.

56. The VAMC's actions in connection with the care and treatment of Mr. and Mrs. Polikoff conformed and/or met that degree of knowledge and skill ordinarily possessed by physicians under similar circumstances.

To the extent that any of the foregoing Findings of Fact should be treated as Conclusions of Law, they shall be deemed as such.

## II.  CONCLUSIONS OF LAW

1. This action is brought under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) *et seq.* (FTCA), and the Court has subject matter jurisdiction.

2. Under the FTCA, the United States is liable in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages. 28 U.S.C. § 2674.

3. The law of the State of California controls the issue of liability and damages. 28 U.S.C. § 1346(b); *Hutchinson v. United States*, 838 F.2d 390, 391 (9th Cir.1988).

4. The United States may not be held to a stricter standard of care than would apply to a private defendant in California under like circumstances. 28 U.S.C. § 1346(b).

■ 5. The United States may not be held liable under any theory of strict liability. *Laird v. Nelms*, 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972).

■ 6. Under California law, plaintiff must establish that some act or omission of the defendant physician fell below the standard of care in the community and that this act or omission was the proximate cause of plaintiff's injury. *Willard v. Hagemesiter*, 121 Cal.App.3d 406, 175 Cal.Rptr. 365 (1981); *Marvin v. Talbot*, 216 Cal.App.2d 383, 30 Cal.Rptr. 893 (1963).

■ 7. The VAMC exercised due care and diligence in accordance with the standard of care in the community with reference to the treatment of Mr. and Mrs. Polikoff.

■ 8. In performing professional services for a patient, a physician has the duty to have that degree of learning and skill ordinarily possessed by reputable members of his profession, practicing in the same or similar locality and under similar circumstances. California Jury Instructions Civil, BAJI 6.00; *Huffman v. Lindquist*, 37 Cal.2d 465, 234 P.2d 34 (1951); *Landeros v. Flood*, 17 Cal.3d 399, 131 Cal.Rptr. 69, 551 P.2d 389 (1976); *Munro v. Regents of University of California*, 215 Cal.App.3d 977, 263 Cal.Rptr. 878 (1989).

9. California law requires only that physicians exercise a reasonable degree of skill, care and knowledge ordinarily possessed and exercised by doctors under similar circumstances in diagnosis and treatment, with no different or higher degree of responsibility than that obtaining in their professional community. *Munro v. Regents of California*, 215 Cal.App.3d 977, 263 Cal.Rptr. 878 (1989); *Carmichael v. Reitz*, 17 Cal.App.3d 958, 95 Cal.Rptr. 381 (1971); *Folk v. Kilk*, 53 Cal.App.3d 176, 126 Cal.Rptr. 172 (1975).

■ 10. Under California law, "medical personnel are held in both diagnosis and treatment to the degree of knowledge and skill ordinarily possessed and exercised by members of their profession in similar circumstances." *Hutchinson v. United States*, 838 F.2d 390, 391 (9th Cir.1988).

■ 11. A physician is not necessarily negligent because he errs in judgment or because his efforts prove unsuccessful. The physician is negligent only if the error in judgment or lack of success is due to a failure to perform his duty. California Jury Instructions Civil, BAJI 6.02. *Huffman v. Lindquist*, 37 Cal.2d 465, 234 P.2d 34 (1951); *Carmichael v. Reitz*, 17 Cal. App.3d 958, 95 Cal.Rptr. 381 (1971).

■ 12. Where there is more than one recognized method of treatment and no one of them is used exclusively and uniformly by all practitioners of good standing, a physician is not negligent if, in exercising his best judgment, he selects one of the approved methods which later turns out to be the wrong selection or one not favored by certain other practitioners. California Jury Instructions Civil, BAJI 6.03. *Clemens v. Regents of University of Cal.*, 8 Cal.App.3d 1, 87 Cal.Rptr. 108 (1970); *Costa v. Regents of University of California*, 116 Cal.App.2d 445, 254 P.2d 85 (1953).

■ 13. The fact that another physician might have elected to treat the case differently or use methods other than those employed by defendant physician does not in itself establish negligence. *Costa v. Regents of University of California*, 116 Cal. App.2d 445, 254 P.2d 85 (1953).

14. The United States did not breach any duty owed under California law to test Mr. or Mrs. Polikoff for the AIDS virus once Mrs. Polikoff showed signs or symptoms of Hepatitis–B and it was determined that she had contracted it from Mr. Polikoff.

■ 15. According to California law, there is no duty to provide a patient with information regarding a test when the testing is not recommended to that patient and would not be recommended to the patient by physicians of ordinary knowledge and skill. *Munro v. Regents of University of California*, 215 Cal.App.3d 977, 263 Cal. Rptr. 878 (1989).

■ 16. The burden of proving the applicable standard of care and the breach thereof rests with the plaintiff. *Carmi-*

*chael v. Reitz,* 17 Cal.App.3d 958, 95 Cal. Rptr. 381 (1971); *Folk v. Kilk,* 53 Cal. App.3d 176, 126 Cal.Rptr. 172 (1975).

17. The standard of professional learning, skill and care is to be determined only from the opinion of physicians who testify as expert witnesses as to such a standard. *Munro v. Regents of University of California,* 215 Cal.App.3d 977, 263 Cal. Rptr. 878 (1989); California Jury Instructions Civil, BAJI 6.30.

18. California law presumes that a physician has done his work properly. Negligence on the part of a physician is never presumed; it must be proved. *Bruce v. United States,* 167 F.Supp. 579, 583 (S.D.Cal.1958); *Huffman v. Lindquist,* 37 Cal.2d 465, 474, 234 P.2d 34 (1951).

19. In addition to plaintiff's burden of establishing a duty owed by the defendant (standard of care), the breach of that duty, and damages, plaintiff must establish that the physician's alleged negligence was a proximate cause of the injury for which damages are sought. *Willard v. Hagemeister,* 121 Cal.App.3d 406, 175 Cal.Rptr. 365 (1981); *Folk v. Kilk,* 53 Cal.App.3d 176, 126 Cal.Rptr. 172 (1975).

20. Under California law, proximate cause must be demonstrated by expert medical testimony. California Jury Instructions Civil, BAJI 6.30. *Carmichael v. Reitz,* 17 Cal.App.3d 958, 95 Cal.Rptr. 381 (1971); *Folk v. Kilk,* 53 Cal.App.3d 176, 126 Cal.Rptr. 172 (1975).

21. Plaintiff in this case has failed to meet her burden of establishing a deviation from the standard of care by physicians of the United States. The standard of care for evaluation and treatment of Mr. and Mrs. Polikoff condition was not breached.

22. Plaintiff did not suffer any damages which may be attributed to the defendant.

* Original lead plaintiff Maria Doe was dismissed as a party after motion and an order of the

23. To a reasonable degree of medical certainty, Mrs. Polikoff had already contracted the AIDS virus by June of 1986.