[No. H024238. Sixth Dist. July 18, 2003.]

SCOTT MICHAEL CURTIS, Plaintiff and Appellant, v.
SANTA CLARA VALLEY MEDICAL CENTER et al., Defendants and
Respondents.

## COUNSEL

Allan Lerch & Associates and Allan H. Lerch for Plaintiff and Appellant.

Hinshaw, Draa, Marsh, Still & Hinshaw and Tyler G. Draa for Defendants and Respondents.

## OPINION

**RUSHING, P. J.**—Plaintiff and appellant Scott Michael Curtis sued defendants and respondents Santa Clara Valley Medical Center and County of Santa Clara for medical malpractice. The trial court entered a judgment of nonsuit. On appeal, Curtis argues the evidence supported an inference of negligence even though no expert testimony was presented. We disagree and will affirm.

### FACTS AND PROCEDURAL BACKGROUND

On May 11, 1998, Curtis was rendered a paraplegic as a result of an automobile accident.[1] On May 19, 1998, Curtis underwent posterior spinal fusion surgery. The surgery was designed to stabilize Curtis's spine and achieve fusion through the insertion of hardware into Curtis's back.

As part of the surgery, Curtis had to be placed "face down" in a "prone position." Pressure on his face was reduced by a foam pillow that rested against his face, head and cheeks reducing pressure to Curtis's eyes, nose and mouth. According to Curtis's anesthesiologist, Dr. Steven King, Curtis's "head was positioned in a foam headrest which had a spot placed face down in his foam headrest which is a cutout for his eyes and his nose."

The foam pillow was used when patients were operated on in prone positions. It was the "only thing" supporting the patient's head. The pillow eliminated contact with the patient's eyes, nose and mouth. The pillow was supposed to minimize the pressure placed on the patient's eyes or other vital structures.

---

[1] Curtis separately settled his claim for being rendered a paraplegic with the driver of the other automobile involved in the accident.

During the course of the surgery, Curtis's face was "periodically" checked to verify that there was no direct pressure on Curtis's eyes or other vital areas. Every 15 minutes, Dr. King, along with his nurse anesthetist, Cheryl McGinnis, inspected Curtis's face. Each inspection was recorded in Curtis's patient chart. No pressure points were observed. Curtis's surgery was considered "uneventful" by Dr. Curtis Comstock, Curtis's primary orthopedic surgeon.

The surgery lasted about six and one half hours. Immediately following the surgery, Curtis's chin was scarred, and his shoulders, neck and face became severely swollen. Curtis was unable to open his eyes for 24 hours.

Patients often develop edema around their eyes and mouths after being placed in the prone position for prolonged periods of time. Swelling occurs as a result of a patient having his or her head placed in a "dependent" position for "sustained periods of time." It is not unusual for a patient's eyes to become swollen shut during this type of procedure.

After the surgery, it was discovered that Curtis was totally blind in his right eye, and had suffered significant visual impairment in his left eye.

Curtis consulted ophthalmologist Dr. William Hoyt. In Dr. Hoyt's view, blindness like that suffered by Curtis was believed to be the result of "ischemic blood supply loss to the optic nerve behind [the patient's] eyeball." Dr. Hoyt asserted that loss of blood supply to the optic nerve could cause blindness. Curtis's blindness could have been due to a combination of factors, according to Dr. Hoyt. These included swelling after the operation, excessive blood loss, low platelet counts, low hemoglobin, or hypotension. As stated by Dr. Hoyt, "The etiology of [Curtis's] blindness is multifactoral." Dr. Hoyt never determined the cause of Curtis's blindness because he never reviewed all the information relating to Curtis's surgery.

On March 3, 1999, Curtis filed his complaint for medical malpractice. He alleged that defendants were negligent and also alleged that they failed to obtain his informed consent before performing the posterior spinal fusion.

On the date trial was scheduled to start, the trial court heard several in limine motions. One such motion was presented by defendants. It arose from alleged irregularities in Curtis's expert disclosure and Curtis's inability or refusal to produce experts for deposition. Due to these irregularities, defendants asked that Curtis's counsel be prohibited from presenting his retained experts at trial.

Curtis's counsel subsequently decided to withdraw his retained experts. As a result, the trial court granted defendants' motion to exclude the retained experts from trial.

Asserting that no expert testimony was required, Curtis's counsel advised the court that he would proceed on a theory of res ipsa loquitur. Defendants objected to Curtis's requested res ipsa loquitur instructions. Curtis then attempted to demonstrate that he could present a prima facie theory of liability based upon the res ipsa loquitur doctrine. At the end of the Evidence Code section 402 hearing, the trial court granted defendants' motion, thereby disallowing any instructions on the doctrine of res ipsa loquitur.

It was stipulated that all proceedings conducted before the court included the substance of Curtis's opening statement. The stipulation was entered into to avoid the burden and expense of selecting a jury before a nonsuit motion could be brought. Based upon the stipulation, the trial court granted defendants' motion for nonsuit. Judgment was entered on January 29, 2002.

## STANDARD OF REVIEW

We exercise de novo review of an appeal from a judgment of nonsuit. We uphold the trial court's determination if, " ' "interpreting the evidence most favorable to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubt in favor of the plaintiff[,] a judgment for the defendant is required as a matter of law." ' [Citations.]" (*Nally v. Grace Community Hospital of the Valley* (1988) 47 Cal.3d 278, 291 [253 Cal.Rptr. 97, 763 P.2d 948]; *Santa Barbara Pistachio Ranch v. Chowchilla Water Dist.* (2001) 88 Cal.App.4th 439, 444–445 [105 Cal.Rptr.2d 856].)

## DISCUSSION

According to Curtis, defendants' negligence was within a layperson's common knowledge. Relying upon the res ipsa loquitur doctrine, Curtis asserts that therefore no expert testimony is necessary. However, as we will explain, this complex operation, together with its risks, place the question beyond the ordinary understanding. The result here does not "speak for itself."

A physician's standard of care is the key issue in a malpractice action and can only be proved by expert testimony unless the circumstances are such that the required conduct is within the layperson's common knowledge. (*Landeros v. Flood* (1976) 17 Cal.3d 399, 410 [131 Cal.Rptr. 69, 551 P.2d 389]; *Flowers v. Torrance Memorial Hospital Medical Center* (1994) 8 Cal.4th 992, 1001 [35 Cal.Rptr.2d 685, 884 P.2d 142].)

"The 'common knowledge' exception is principally limited to situations in which the plaintiff can invoke the doctrine of res ipsa loquitur, i.e., when a layperson 'is able to say as a matter of common knowledge and observation that the consequences of professional treatment were not such as ordinarily would have followed if due care had been exercised.' [Citations.]" (*Flowers v. Torrance Memorial Hospital Medical Center*, *supra*, 8 Cal.4th at p. 1001, fn. omitted.)[2]

For example, it is common knowledge that leaving scissors in a patient's abdomen after surgery is an occurrence that is ordinarily the result of someone's negligence. (*Leonard v. Watsonville Community Hosp.* (1956) 47 Cal.2d 509, 514 [305 P.2d 36].) Similarly, it is commonly understood that negligence would ordinarily be suspected when a person sustains a shoulder injury during an appendectomy. (*Ybarra v. Spangard* (1944) 25 Cal.2d 486, 488–489 [154 P.2d 687]; see also *Bardessono v. Michels* (1970) 3 Cal.3d 780, 789–790 [91 Cal.Rptr. 760, 478 P.2d 480] [listing cases where courts have found sufficient common knowledge among laypersons to show, even in the absence of expert testimony, that there was negligence].)

"Where the matter is regarded as within the common knowledge of laymen, as where the surgeon saws off the wrong leg, or there is injury to a part of the body not within the operative field, it has been held that the jury may infer negligence without the aid of an expert." (Prosser on Torts (4th ed. 1971) § 32, pp. 167–168.) As one commentator observed: "There is an element of drama and of the freakish and improbable in the typical res ipsa case. ..." (See Prosser, *Res Ipsa Loquitur in California* (1949) 37 Cal. L.Rev. 183, 192.)

█ The complexity of the medical procedure is a factor in determining the necessity of expert testimony. The more complex or unusual the medical process, the more likely it is that expert testimony will be required to establish whether or not the injury was the result of negligence. (See *Barton v. Owen* (1977) 71 Cal.App.3d 484, 494–495 [139 Cal.Rptr. 494].)

For example, in *Folk v. Kilk* (1975) 53 Cal.App.3d 176 [126 Cal.Rptr. 172], the trial court refused to give a res ipsa loquitur instruction. There, the

---

[2] In *Kohler v. Aspen Airways, Inc.* (1985) 171 Cal.App.3d 1193 [214 Cal.Rptr. 720], the court described the genesis of the res ipsa loquitur doctrine: " 'In the year 1863 a barrel of flour rolled out of the window of an English warehouse and into the lives of all tort lawyers. It fell upon a passing pedestrian, who sued the owner of the warehouse for his injuries. At the trial, a question arose as to the necessity of some affirmative proof of the defendant's negligence; and in the course of a brief colloquy with counsel, Baron Pollack made use of a familiar and homely phrase. He said, "The thing speaks for itself." Unfortunately, since he was a classical scholar in the best tradition of English judges, he said it in Latin.' " (*Id.* at p. 1199, fn. 10, quoting from Prosser, *Res Ipsa Loquitur in California* (1949) 37 Cal. L.Rev. 183.)

patient developed a brain abscess five days after having a tonsillectomy. It was claimed that the doctors negligently failed to obtain the results of a throat culture before the surgery. Of the five specialists who testified, none had ever heard of a brain abscess occurring immediately after a tonsillectomy. (*Id.* at pp. 181–182.)

After discussing the origination of the res ipsa doctrine and its applicability in a medical malpractice setting, *Folk* announced the following rule: "Where a medical process or procedure is not a matter of common knowledge, expert testimony is necessary to determine whether a probability of negligence appears from the happening of an accident or untoward result. [Citation.]" (*Folk v. Kilk, supra,* 53 Cal.App.3d 176, 185.)

Applying that rule to the facts before it, *Folk* observed: "In our opinion, the etiology of brain abscesses and the standards of care prevailing in the medical community as concern tonsillectomies are not matters of common knowledge and therefore we are bound by the expert testimony. It is not a matter of common knowledge that when a brain abscess begins to develop shortly after a tonsillectomy, the abscess probably was caused by negligence. Even among experts little is known about the causation of brain abscesses. Their nature is such that they are difficult to study. Since most brain abscesses originate in areas other than the throat (sinus passages, middle ear and lungs being the most common sources), and over a longer time, it is not even common knowledge that the abscess was probably caused by the tonsillectomy, let alone that the abscess was probably caused by a negligently performed tonsillectomy." (*Folk v. Kilk, supra,* 53 Cal.App.3d at pp. 185–186.)

In this case, there was expert testimony that blindness is a known, albeit rare, risk associated with posterior spinal fusions.[3] ■ Dr. King testified that blindness occurring as a result of lumbar surgery when patients are placed in a prone position "is a widely known complication of surgeries that take place in the prone position." Indeed, Curtis's counsel himself stated that "The medical evidence in this case is that the risk of blindness is known but it's rare. Now, what causes it isn't known. [¶] … [¶] [B]ut the medical evidence is that it's a known occurrence." Neuro-ophthalmologist Dr. Richard Sogg

---

[3] ■ Of course, the fact that a medical injury rarely occurs does not automatically justify an inference of negligence. (*Siverson v. Weber* (1962) 57 Cal.2d 834, 839 [22 Cal.Rptr. 337, 372 P.2d 97].) Inferring negligence merely because an injury rarely occurs would place an unfair burden on the medical profession and would discourage the use of new procedures which may pose inherent risks even in the exercise of due care. (*Ibid.*)

examined Curtis. Dr. Sogg testified that he never formed an opinion regarding whether a deviation from the standard of care caused Curtis's blindness. Dr. Sogg stated that patients like Curtis can and do suffer blindness even in the absence of negligence. In Dr. Sogg's opinion, even with knowledge of the risk factors for Curtis's type of injury, blindness could not necessarily be prevented.

Given this evidence, the applicability of the rule announced in *Folk* is clear. As in *Folk*, the procedure in this case—a posterior spinal fusion—is not one that is commonly understood or one where the standard of care is commonly known by laypersons. Given the complexity of the procedure, and the evidence presented, there was no basis within common knowledge for a layperson to conclude that Curtis's blindness, sustained as a result of a posterior spinal fusion, was the result of negligence. Thus, as in *Folk*, "expert testimony was necessary to determine whether a probability of negligence appears from the happening of an accident or untoward result." (*Folk v. Kilk, supra*, 53 Cal.App.3d at p. 185.)

As this case demonstrates, when a procedure is complex, results that might be considered "freakish" or "improbable" may actually be known complications, or might be unavoidable given the circumstances. Thus, while a layperson might find it surprising to learn that blindness can result from an operation upon a patient's back even in the absence of negligence, that is exactly what defendants' expert testimony demonstrated. Blindness is a known, albeit rare, risk of posterior spinal fusions, and can occur even without negligence. This evidence was not rebutted. There was no evidence whatsoever suggesting that defendants deviated from any standard of care.

The circumstances of this case are tragic and we emphasize that we do not know whether or not there was negligence. We hold only that this was not the type of case where a res ipsa loquitur instruction should have been given. Curtis's attorney was required to present expert testimony to establish any deviation from the standard of care. Because no such expert testimony was presented, the trial court properly granted defendants' motion for nonsuit.[4]

---

[4] Although defendants address the issue of informed consent in their brief, Curtis did not raise it in his opening brief, and he has not filed a reply brief. We therefore consider this issue to be waived.

## DISPOSITION

The judgment is affirmed.

Premo, J., and Elia, J., concurred.